**AQUILA SOUTHWEST PIPELINE, INC., Appellant/Cross–Appellee,**

v.

**HARMONY EXPLORATION, INC., Appellee/Cross–Appellant.**

No. 04–00–00112–CV.

Court of Appeals of Texas, San Antonio.

Feb. 14, 2001.

Jesse R. Castillo, Paul A. Fleck, Martin, Drought & Torres, Inc., San Antonio, for Appellant.

Britton D. Monts, Jason T. Mackey, Tom C. McCall, Monts & Ware, L.L.P., Dallas, for Appellee.

Sitting: PHIL HARDBERGER, Chief Justice, ALMA L. LÓPEZ, Justice, KAREN ANGELINI, Justice.

## OPINION

ALMA L. LÓPEZ, Justice.

This appeal arises from a breach of a natural gas purchase and processing contract between the appellant, Aquila Southwest Pipeline, Inc. ("Aquila"), a gas purchaser/processor and the appellee, Harmony Exploration, Inc. ("Harmony"), an oil and gas producer. This case is governed by the Uniform Commercial Code ("UCC"). Aquila appeals the trial court's judgment awarding damages, attorney's fees and prejudgment interest in favor of Harmony. Harmony cross-appeals the trial court's judgment granting Aquila's Motion for Judgment Notwithstanding the Verdict ("JNOV") on jury questions three (3) and four (4). We affirm the trial court's judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

Harmony is a small oil and gas company that has several producing oil and gas wells in Burleson County, Texas. All of Harmony's wells are classified as oil wells under Texas Railroad Commission rules, yet the wells have produced substantial quantities of natural gas. Under the Railroad Commission rules, natural gas produced from a well classified as an oil well is called casinghead gas. In order for Harmony to market and sell natural gas produced from a well, a gathering line must be installed to take the gas from the wellhead into a common carrier pipeline system. Aquila is a major common carrier pipeline system in Texas and is the dominant purchaser of natural gas produced in the Giddings Field, where Harmony's wells are located.

Aquila's predecessor company was Clajon Gas Company, L.P. ("Clajon"). In 1991, Clajon's gas purchase contracts were transferred and assigned to Aquila. Harmony and Aquila entered into a gas purchase and processing contract on May 1, 1991 ("the 1991 contract"), in which Aquila agreed to purchase and process Harmony's casinghead gas on several leases. In this contract, Harmony's gas would be delivered at the wellhead to Aquila. Aquila would take the gas into its system, process the gas to strip out and pull out the liquids to be sold separately, and then sell the residue gas at the tailgate of the plant. The amount paid to Harmony would be determined from the residue and the liquids. The 1991 contract had a four-year base term with an "evergreen" clause that renewed it for successive one-year periods unless terminated by either party. The 1991 contract specifically stated:

3.1 Subject to the terms and conditions of this contract, Seller hereby commits and dedicates to the performance of this Contract all of Seller's Gas Reserves . . . to Buyer at the Point(s) of Delivery . . .

. . . . .

5.1 During the term of this Contract, Buyer shall have the right to take and purchase one hundred percent (100%) of Seller's Delivery Capacity . . .

. . . . .

5.2 . . . The parties expressly recognize that Buyer's obligations to take pursuant to the rules or otherwise shall be subject to the ability of Buyer's facilities to handle all gas connected thereto, less-

ening or fluctuating demand for gas on Buyer's or its resale purchaser's system, the location on Buyer's or its resale purchaser's system of gas supplies and demand, and any other valid reason such as force majeure, whether or not of a kind herein mentioned.

. . . . .

5.5 In the event any of Buyer's facilities are of insufficient capacity to handle all of the gas connected thereto, Buyer shall be obligated only to take gas ratably from all leases and/or wells delivering into such facilities.

. . . . .

Harmony and Aquila renegotiated a new contract dated May 1, 1995 ("the 1995 contract"). According to Harmony, since May 1, 1995, Aquila's gas purchases from Harmony have been governed by the 1995 contract, which included all of Harmony's wells. However, according to Aquila, the 1995 contract was never executed and Aquila's gas purchases from Harmony have been governed by the 1991 contract.

On August 13, 1996, Harmony filed a lawsuit against Aquila. On February 26, 1999, Harmony filed a third amended petition alleging two claims of breach of contract, discrimination by a common carrier, and class allegations on behalf of producers in Burleson County, Texas. On August 31, 1999, Aquila filed special exceptions to Harmony's third amended petition, specially excepting to Harmony's second claim of discrimination by a common carrier. The case was tried on September 7, 1999. At the conclusion of Harmony's case-in-chief, the trial court granted Aquila's motion for directed verdict on Harmony's claim of discrimination by a common carrier, and denied Aquila's motion for directed verdict on Harmony's breach of contract claims. On September 13, 1999, the jury returned a verdict in favor of Harmony on two breach of contract claims

and awarded damages on those claims and attorneys' fees. On October 22, 1999, Aquila filed a motion for JNOV on all five questions submitted to the jury that Harmony take nothing. The trial court granted Aquila's motion for JNOV as to questions three (3) and four (4), and denied Aquila's motion as to questions one (1), two (2), and five (5). On November 23, 1999, the trial court awarded Harmony damages, attorneys' fees, prejudgment interest, court costs, and post-judgment interest. On February 22, 2000, the trial court denied Aquila's motion for new trial.

On appeal, Aquila complains in six issues that the trial court erred in submitting the charge to the jury, that the evidence was legally and factually insufficient to support the jury's verdict, and that the trial court erred in awarding attorneys' fees and prejudgment interest. On cross appeal, Harmony complains in four issues that the trial court erred in granting Aquila's motion for JNOV as to jury questions three (3) and four (4).

### JURY CHARGE ERROR

In its first and second issues, Aquila complains that the trial court erred in submitting question one (1) to the jury because: (1) Harmony failed to adequately plead that it was invoking the "best efforts" provision as required by section 2.306 of the UCC; and (2) the 1991 contract was not an "exclusive dealing" contract pursuant to section 2.306(b) of the UCC. *See* TEX. BUS. & COM.CODE ANN . § 2.306 (Vernon 1994). Question one (1) of the jury charge states: "Do you find from a preponderance of the evidence that Aquila did not use its best efforts to process Harmony's gas from the Harmony Wells?" The jury responded, "Yes."

### A. *Standard of Review*

■ In reviewing a trial court's submission of jury questions, appellate courts

employ an abuse of discretion standard. *See* TEX.R. CIV. P. 277; *Texas Dep't of Human Servs. v. E.B.*, 802 S.W.2d 647, 649 (Tex.1990); *Green Tree Acceptance, Inc. v. Combs*, 745 S.W.2d 87, 89 (Tex.App.—San Antonio 1988, writ denied). A trial judge must submit requested questions to the jury if the pleadings and evidence support them. *See* TEX.R. CIV. P. 278; *Hyundai Motor Co. v. Rodriguez ex rel. Rodriguez*, 995 S.W.2d 661, 663 (Tex.1999). For the appellate court to reverse on a jury charge error, the appellant must show harmful error. *See Boatland of Houston, Inc. v. Bailey*, 609 S.W.2d 743, 749–50 (Tex.1980). Error in the jury charge is reversible only if it probably caused the rendition of an improper judgment or probably prevented the appellant from properly presenting the case on appeal. *See* TEX.R.APP. P. 44.1(a); *Timberwalk Apts., Partners, Inc. v. Cain*, 972 S.W.2d 749, 756 (Tex.1998). To determine whether an alleged error in the charge is reversible, the reviewing court must consider the pleadings of the parties, the evidence presented at trial, and the charge in its entirety. *See Timberwalk Apts.*, 972 S.W.2d at 756; *Island Recreational Dev. Corp. v. Republic of Texas Sav. Ass'n*, 710 S.W.2d 551, 555 (Tex.1986).

### B. *Pleadings*

In its first issue, Aquila complains that trial court erred in submitting jury question one (1) because Harmony failed to plead that the 1991 contract was missing a quantity term or that the contract was an exclusive dealing contract or that the trial court should impose the "best efforts" quantity provision from the UCC or that Aquila failed to use its "best efforts." Aquila argues that Harmony's pleadings failed to place Aquila on notice of any cause of action pursuant to section 2.306(b) of the UCC governing "exclusive dealings" and "best efforts." In response, Harmony contends that the trial court did not commit error by submitting jury question one (1) because: (1) Harmony adequately pled breach of contract governed by the UCC; (2) Harmony was not required to plead law; and (3) Aquila failed to file special exceptions to Harmony's breach of contract claims and therefore waived any right to challenge the sufficiency of Harmony's pleadings on appeal.

Harmony's pleadings alleged that Aquila breached the 1991 and 1995 contracts in the following respects: (1) not paying Plaintiff all sums due under the contract for the sale of liquids; (2) not properly paying Plaintiff for all sums due under the contract; (3) charging Plaintiff excess compression costs; (4) not paying Plaintiff based on the price formula set forth in the contract; and (5) failing to process Plaintiff's casinghead gas as required by the express terms of the contracts.

Despite Aquila's arguments regarding Harmony's defective pleadings, there are two types of pleading defects to which the opponent must object before trial: (1) defects in form (e.g., failure to include a verification); and (2) defects in substance (e.g., failure to plead a cause of action or defense with sufficient specificity). If the opponent does not object to the pleadings by special exception before trial, the defects are waived. *See* TEX.R. CIV. P. 90; *Shoemake v. Fogel, Ltd.*, 826 S.W.2d 933, 937 (Tex.1992). Aquila failed to file a special exception before trial challenging the sufficiency of Harmony's pleading. As a result, Aquila waived its right to complain about this issue on appeal. *See* TEX.R.APP. P. 33.1. Therefore, we overrule this issue.

### C. *"Best Efforts"*

In its second issue, Aquila complains that the trial court erred in submitting jury question one (1) because the 1991 contract was not an "exclusive dealing"

contract under section 2.306 of the UCC. In addition, Aquila contends that the "best efforts" obligation in section 2.306(b) does not apply to gas purchase and processing contracts. Aquila relies on *Northern Natural Gas Co. v. Conoco, Inc.*, 986 S.W.2d 603 (Tex.1998) and *Lenape Resources Corp. v. Tennessee Gas Pipeline Co.*, 925 S.W.2d 565 (Tex.1996) to support its argument, but neither of these cases apply to this case.

■ A contract for the sale of oil or natural gas is a contract for the sale of goods under the UCC. *See* TEX. BUS & COM.CODE ANN . § 2.105(a) (Vernon 1994); *Fletcher v. Ricks Exploration,* 905 F.2d 890, 892 (5th Cir.1990); *Howell Crude Oil Co. v. Tana Oil & Gas Corp.,* 860 S.W.2d 634, 637 (Tex.App.—Corpus Christi 1993, no writ). Section 2.306 of the UCC is a gap-filler provision which supplies a quantity term in the contract when the agreement between the parties is silent. Section 2.306(b) provides: "A lawful agreement by either the seller or the buyer for exclusive dealing in the kind of goods concerned imposes unless otherwise agreed an obligation by the seller to use best efforts to supply the goods and by the buyer to use best efforts to promote their sale." *See* TEX. BUS. & COM. CODE ANN. § 2.306(b) (Vernon 1994). In other words, section 2.306(b) permits the quantity term in an exclusive dealing contract to be measured in terms of "best efforts." Comment 5 to section 2.306 provides that parties in exclusive dealing contracts are bound to use reasonable diligence as well as good faith in their performance of the contract. *See id.* § 2.306, cmt. 5. Although Aquila's authorities do not control here, the opinions are helpful in understanding when section 2.306(b) applies.

In *Northern Natural Gas Co. v. Conoco, Inc.,* Northern and Conoco's predecessor signed an agreement in 1979. *See Conoco,* 986 S.W.2d at 604. In 1979, Northern had dozens of contracts to buy natural gas from gas producers in Texas and elsewhere. *See id.* Before Northern could ship the gas for resale to customers in the Midwest, the gas had to be gathered and compressed at a processing facility, such as Conoco's. *See id.* The agreement provided that Northern would deliver and Conoco would process all of the gas that Northern purchased, and that the agreement would remain in effect for the life of the various gas purchase contracts, but not less than twenty years. *See id.* at 604–605. The federal regulation of natural gas between 1978 and 1992 drastically affected Northern's business and Northern's gas sales dropped as Northern canceled or declined to renew gas purchase contracts. *See id.* at 605. Conoco sued Northern for breach of contract, alleging that Northern's attempts to extricate itself from the gas purchase contracts violated the agreement. *See id.* The Supreme Court of Texas held that although Northern was obligated to deliver gas for processing that it bought under the dedicated gas purchase contracts, Northern was not obligated to perpetuate the gas purchase contracts or deliver gas for processing if no gas was purchased. *See id.* at 606. The Court found that section 2.306 of the UCC did not apply because of the service nature of the Conoco contract which did not involve a sale. *See id.* at 607. Unlike the gas processing-only contract in *Conoco,* the gas purchase and processing contract in the instant case requires Aquila to both purchase and process Harmony's gas.

■ In *Lenape Resources Corp. v. Tennessee Gas Pipeline Co.,* the Supreme Court of Texas determined whether section 2.306 of the UCC applied to the take-or-pay gas purchase agreement between Lenape and Tennessee. *See Lenape,* 925

S.W.2d at 567. Section 2.306 applies only if the take-or-pay contract is an output contract and the parties have otherwise opted to vary the quantity of obligations by agreement. *See id.* at 569. The gas purchase agreement between Lenape and Tennessee was not a processing contract, but was a take-or-pay contract. Under a take-or-pay contract, the buyer does not have to buy any production. *See id.* An output contract, on the other hand, is one in which the buyer agrees to buy the seller's entire output of production. *See id.* The Court held that section 2.306 did not apply to this gas purchase agreement because the parties agreed to quantity obligations that differed from those imposed by section 2.306. *See id.* at 570. The Court explained that section 2.306 is a gap-filler provision and may be varied by the parties' agreement. *See id.* Section 2.306 fills in the quantity term only when a contract does not unambiguously specify the quantity of the output of the seller or the requirements of the buyer. *See id.* It does not apply when the contract either specifies a numeric quantity or provides a standard for determining a specific quantity. *See id.* Because Lenape and Tennessee agreed in the gas purchase agreement that Tennessee would buy 85% of Lenape's delivery capacity, section 2.306 was not needed to make the contract definite. *See id.* at 570–71. In *Lenape*, the Court was dealing with subsection (a) in section 2.306 and did not address the "best efforts" obligation in an "exclusive dealing" contract under subsection (b). The gas purchase and processing contract between Harmony and Aquila is an entirely different kind of agreement than the take-or-pay contract in *Lenape*. The 1991 contract between Harmony and Aquila assigned the exclusive right to process Harmony's gas to Aquila, and the parties did not agree in the contract to modify or waive the best efforts provision required by section 2.306(b).

Because Aquila possessed the exclusive right to process Harmony's gas, Aquila determined the value Harmony received for its gas. Although title to the gas passed at the wellhead, the price that Harmony was paid for its gas was not calculated at the point of passage of title. The actual price Harmony received for the sale of gas depended upon whether Aquila fulfilled its obligation to process gas beyond the point of delivery. As a result, the "best efforts" obligation of section 2.306(b) applied to the 1991 contract. Because section 2.306(b) applied, the trial court properly submitted jury question one (1) to the jury. Accordingly, we overrule this issue.

### LEGAL AND FACTUAL SUFFICIENCY

In its third and fourth issues, Aquila complains that the evidence in this case is not legally and factually sufficient to support the jury's verdict. Specifically, Aquila contends that there is no evidence that Aquila failed to use its best effort to promote the sale of Harmony's gas and there is no evidence of damages in the amount of $200,000.

### A. *Applicable Law*

The elements in a suit for breach of contract are: (1) a valid contract; (2) the plaintiff performed or tendered performance; (3) the defendant breached the contract; and (4) the plaintiff was damaged as a result of that breach. *See Hussong v. Schwan's Sales Enterprises, Inc.,* 896 S.W.2d 320, 326 (Tex.App.—Houston [1st Dist.] 1995, no writ). Where the UCC applies, common-law rules of law regarding breach of contract do not apply. *See* TEX. BUS. & COM.CODE ANN. § 2.102 (Vernon 1994); *Glenn Thurman, Inc. v. Moore Construction, Inc.,* 942 S.W.2d 768, 771 (Tex.App.—Tyler 1997, no writ).

B. *Standard of Review*

 Challenges to the legal sufficiency of the evidence must be sustained when the record discloses one of the following: (1) a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla of evidence; or (4) the evidence established conclusively the opposite of a vital fact. *See Merrell Dow Pharmaceuticals, Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997). In reviewing legal sufficiency, we are required to determine whether the proffered evidence as a whole rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *See Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10, 25 (Tex.1994).

 If a party is attacking the legal sufficiency of an adverse finding of an issue on which it did not have the burden of proof, the attacking party must demonstrate on appeal that there is no evidence to support the adverse finding. *See Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex.1983). In reviewing a no-evidence issue, we must consider all of the record evidence in a light most favorable to the party in whose favor the verdict has been rendered and indulge every reasonable inference deducible from the evidence in that party's favor. *See Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 285–86 (Tex.1998).

 When reviewing a challenge to the factual sufficiency of the evidence, we must consider all of the evidence in the record. *See Plas–Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex.1989). If a party is attacking the factual sufficiency of an adverse finding on an issue to which the other party has the burden of proof, the attacking party must demonstrate that there is insufficient evidence to support the adverse finding. *See Hickey v. Couchman*, 797 S.W.2d 103, 109 (Tex. App.—Corpus Christi 1990, writ denied). In reviewing an insufficiency of the evidence challenge, we must first consider, weigh, and examine all of the evidence which supports and which is contrary to the jury's determination. *See Plas–Tex*, 772 S.W.2d at 445. We should set aside the verdict only if the evidence which supports the jury's finding is so weak as to be clearly wrong and manifestly unjust. *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986).

C. *Discussion*

 We now examine the record to determine whether the evidence is legally and factually sufficient to support the jury's finding. Glen Chmelar, the owner of Harmony, testified that eight of his ten wells were under the 1991 contract. By signing the contract with Aquila, Harmony dedicated 100% of all the production of gas from eight wells to Aquila and gave Aquila an exclusive right to process Harmony's gas. In turn, Aquila agreed to purchase Harmony's gas at the wellhead. Further, Chmelar testified that Harmony hired James Spillane, a producer advocate who works with oil and gas producers to obtain the best prices they could for their oil and gas production, and to renegotiate the 1991 contract with Aquila to include the Victory Wells 1 and 2. The record indicates that on February 27, 1995, Spillane sent a letter to Aquila in Harmony's behalf terminating the 1991 contract:

> ... please allow this letter to serve as buyer's notice of termination of the existing contract. It is anticipated that within the stated sixty (60) day period, a new contract will be negotiated....

> In the event that we are unable to reach specific contract terms within said sixty

(60) day period ... Harmony specifically request[s] that Aquila continue, on a month to month basis, (or other mutually acceptable terms) to gather, treat, and process all gas as is currently being produced from Harmony's lands, under terms no less favorable that [sic] those of offset operators.

In response, Aquila faxed a letter to Harmony on February 28, 1995 accepting the termination of the 1991 contract:

Aquila Southwest Pipeline Corporation (Aquila) accepts Harmony Exploration, Inc.'s termination of the above referenced Contract, and in accordance with such termination, Aquila will close the valves on our metering equipment located at the affected wells on May 1, 1995.

Chmelar testified that he did not intend to disconnect all eight wells and stop selling gas. Instead, Gene Heideman, a contract advisor at Aquila, told Chmelar that if he sent the termination letter to Aquila, Aquila would get the 1995 contract process started. Spillane was concerned with Aquila's response that Aquila would close the valves on Harmony's metering equipment and immediately called Heideman to work out the problem. According to Spillane, Heideman told him, "Don't worry about it. We'll get you a contract. We'll continue negotiating."

On April 21, 1995, Heideman sent the 1995 contract proposal to Spillane. The proposal did not include Victory Wells 1 and 2. Spillane attached the Victory 1 and 2 leases to the contract and Chmelar signed the contract. Spillane met with Heideman to discuss the 1995 contract. Later, Spillane called Chmelar and told him that Aquila was not signing the 1995 contract. However, to this day, Aquila is still taking Harmony's gas on the original eight wells and paying under the terms of the 1991 contract.

Spillane testified that under the 1991 contract, Harmony dedicated all of its stream of gas from eight wells to Aquila. According to Spillane, article 4.3 of the 1991 contract indicated that Harmony could not install any of its own equipment to do any of its own processing of gas. Harmony did not have the right to process its own gas or take its gas out of Aquila's system and take it to process somewhere else. Harmony had to sell all of its gas to Aquila and allow Aquila to be the exclusive processor of its gas.

The evidence shows that Aquila had been gathering casinghead gas into its La Grange plant for processing and liquids stripping for a number of years. Until 1992, the plant was running at or near 90–95% efficiency and recovering over 90% of all casinghead liquids (i.e., Propane, Ethane, I–Butane, N–Butane, and Pentanes+) and selling the residue "dry" gas. Producers were paid a percentage of the proceeds from the sale of each of these products, including the residue gas. Beginning in 1992, Aquila began an aggressive campaign to connect as many volumes as possible into their system, thereby making Aquila the premier Austin Chalk gatherer. Realizing it required additional processing facilities for these volumes, Aquila built its Sommerville plant, which came on line in April 1993. However, as a result of the activities of its buyers and by producer drilling, volumes of Aquila's plants greatly exceeded its ability to process the gas. Rather than restrict its buyers or new gas into its system, Aquila began to utilize a segment of pipe (originally designed for emergencies) to allow all excess volumes to bypass the plants and go straight into the sales line at the plant's tailgate. Aquila began bypassing approximately 20% of its gas, but later bypassed as high as 50% of the gas it received. The gas was bypassed around Aquila's plant and went to Exxon's Katy plant and then processed. All cas-

inghead volumes remained intact, but stripping of liquids did not occur for all bypassed gas. This bypassed gas had a slightly higher BTU content, but it sold as the lowest value product in Aquila's casinghead stream. Liquids extracted from casinghead gas may receive twice the value of residue gas at the tailgate.

Aquila contended that the emergency bypass provision of the gas contract that allowed for the bypassing of the plant when the plant is down or out of service should apply for these excessive volumes. The emergency bypass provision in this contract was provided in the force majeure provision. Article 14.2 of the contract stated that the term "force majeure" means:

acts of God, strikes, lockouts or other industrial disturbances, acts of the public enemy, wars, blockades, insurrections, riots, epidemics, landslides, lightning, earthquakes, fires, storms, floods, washouts, arrests, and restraints of the Government, either federal or state, civil or military, civil disturbances, explosions, sabotage, malicious mischief, breakage or accident to machinery or lines of pipe, necessity of making repairs and maintenance to Buyer's facilities, freezing of wells or lines of pipe, refusal or inability of Buyer's resale purchaser(s) to take deliveries, partial or entire failure of gas supply or market, inability of any party hereto to obtain right-of-way, necessary materials, supplies or permits, any of the foregoing or any action due to existing or future rules, regulations, orders, laws or proclamations of governmental authorities (both federal and state), including both civil and military, and any other cause whether of the kind herein enumerated or otherwise, not reasonably within the control of the party claiming suspension.

Aquila utilized the force majeure provision in the contract to justify the bypass of a significant volume of gas for at least two years while Aquila sought even more volumes into its system. Recovery percentages for casinghead gas had fallen to as little as 43% for some products. This resulted in a significant reduction in payments to producers for their liquids that was not offset by a corresponding increase in dry gas payments.

According to Spillane, the force majeure provision in the contract did not excuse Aquila's obligation to process Harmony's gas. If there was an actual force majeure situation, the contract specified that the buyer would have to give notice to the producer that it would not be able to fulfill its processing requirement. In this case, Spillane testified that there was no evidence that Aquila gave any notice to Harmony that it was unable to fulfill its processing requirement or that Aquila gave Harmony the right to free up that portion of its gas that Aquila was not willing to process. Even though Aquila had not processed a significant portion of Harmony's gas, Harmony was still obligated under the contract to continue selling and delivering all of its gas to Aquila.

In addition, Martin Bueno, a Volume Administrator in the Liquids Division at Aquila who accounted for the liquids and administrated the provisions of the gas purchase and processing contract, testified that when there was a situation where more gas was being taken than could be put into the pipeline system, the Railroad Commission required that Aquila take that gas ratably from all of the various producers. Only under emergency or scheduled work on plants did Aquila ever go into proration mode. "Emergency" would be a pipeline break or equipment facility failure. The evidence shows that Aquila never went into a proration mode and took

gas ratably from the various producers during this time.

According to Spillane, Aquila wanted to expand its market beyond what it could process, but this was not a force majeure situation and Aquila should have paid Harmony as if they had processed its gas. Spillane described the standard industry methodology he used in making his calculations and testified that Harmony suffered damages in the amount of $200,000 as unpaid revenues on the eight Harmony wells under the contract.

Bueno also testified that on average, a producer would call Aquila and want to know something about the way they were being paid. According to Bueno, this was a normal part of the business. A couple of times a year, a producer would come in and audit Aquila's books. Bueno began reviewing Harmony's claim for unpaid revenues in April 1995. The calculations that Harmony had sent to Aquila had three columns: 1) unpaid liquids revenue; 2) additional undistributed revenues on a BTU basis, and 3) excess compression costs. Bueno looked at each calculation in each column and determined whether the number that was being calculated was arrived at in accordance to the terms of the contract and if it was valid. After reviewing Harmony's worksheets detailing unpaid revenues under the contract, Bueno found that there were errors in each of the calculated schedules that discredited Harmony's claims of underpayment. Specifically, Bueno contended: (1) the theoretical shrinkage value was a calculated MMBTU number subtracted from theoretical gallons—since MMBTUs cannot be subtracted from gallons, these calculations nullify any subsequent conclusion of unpaid revenue on this basis; (2) empirical data was used to calculate an "additional MCF" which was added to the adjusted MCF— the MMBTU processed included theoreti-

cal gallons and should not have been "additional MCF," and was not according to the contract; and (3) the excess compression fees calculated were based on total MCF and was contrary to the terms of the contract. The contract terms charged fees on a MMBTU per stage of compression per each individual well. On July 25, 1995, Spillane met with Bueno to discuss Harmony's unpaid revenue claim and the mistakes Spillane made in his calculations. The evidence shows that Spillane corrected any errors he made in his calculations and submitted a new report.

John Berghammer, an oil and gas consultant, was hired by Aquila to review Spillane's analysis of Harmony's unpaid revenue claim. Berghammer reviewed Spillane's reports, a copy of the 1991 contract, the depositions of Spillane and Bueno, and researched consumer price index inflation factors. Berghammer took one month, analyzed it, and critiqued the methodology that Spillane used to enter his calculations. Berghammer testified that Spillane used too much shrinkage in his calculation of unpaid revenues. Spillane, on the other hand, testified that he used the numbers specified by the contract to determine the shrinkage. Further, according to Berghammer, Spillane calculated the average wellhead price wrong. According to Berghammer, the average well price should just be the total amount of dollars paid for the liquids and the residue divided by the gross wellhead volumes to get a price. Instead, Spillane took the liquids value and divided that by the total wellhead volume. As for the residue, Spillane took the residue dollars, and divided only by the residue MCF and not the residue volume. As a result, Berghammer and Spillane disagreed on how to calculate the average wellhead price. In addition, there was no specific definition of the average price per wellhead in the contract.

Viewing the evidence in the light most favorable to Harmony, and using every reasonable inference deducible in its favor, we find that the evidence is legally sufficient to support the jury's finding that Aquila failed to use its best efforts to process Harmony's gas. Specifically, the evidence shows that Harmony's gas was bypassed around Aquila's plant and then processed and that Aquila failed to take the gas ratably from its producers. As a result, Harmony received a lower value for the recovery of its casinghead gas than the contract stipulated. In addition, the evidence is legally sufficient to support the jury's award of damages in the amount of $200,000; namely, the evidence shows the calculation of damages for unpaid revenues and the standard methodology used in making the calculations. Accordingly, Aquila has failed to demonstrate on appeal that there is no evidence to support the jury's finding.

■ In addition, we find that the evidence was factually sufficient for the jury to find that Aquila failed to use its best efforts to process gas in accordance with the contract. We also find that the evidence was factually sufficient to support the jury's award of $200,000. Although the evidence shows that there were errors in Spillane's calculations on unpaid revenues, the evidence also shows that Spillane corrected any errors he made in his calculations and submitted a new report. In addition, the evidence shows that Berghammer, Aquila's expert witness, disagreed with Spillane on how to calculate the average wellhead price. The jury, as the trier of fact, judges the credibility of the witnesses, assigns the weight to be given their testimony, and resolves any conflicts or inconsistencies in the testimony. *See Gunn Buick, Inc. v. Rosano,* 907 S.W.2d 628, 630 (Tex.App.—San Antonio 1995, no writ). Because the jury resolved any con-flicts in the expert testimony regarding calculation of the amount of damages, we find that the evidence was factually sufficient to support the jury's award of damages. In considering, weighing, and examining all of the evidence which is contrary to the jury's determination, we do not find the weight of the evidence to be wrong or unjust.

Because the evidence was legally and factually sufficient to support the jury's finding, we overrule issues three and four.

### ATTORNEY'S FEES

■ In its fifth issue, Aquila complains that the trial court erred in awarding Harmony attorney's fees. The jury awarded damages for Harmony's reasonable and necessary attorney's fees in the amount of $133,000 for preparation and trial and $20,000 for appeals. Specifically, Aquila contends that there is no evidence to support the jury's award and the trial court's judgment.

■ The standard of review of a trial court's award granting attorney's fees is sufficiency of the evidence. *See Stewart Title Guar. Co. v. Sterling,* 822 S.W.2d 1, 12 (Tex.1991); *Snoke v. Republic Underwriters Ins. Co.,* 770 S.W.2d 777, 777–78 (Tex.1989) (per curiam). An award of attorney's fees must be based upon some statutory or contractual authority. *See* TEX.REV.CIV. PRAC. & REM.CODE ANN. § 38.001 (Vernon 1997); *Dallas Cent. Appraisal Dist. v. Seven Inv. Co.,* 835 S.W.2d 75, 77 (Tex.1992). In reviewing the reasonableness of an award of attorney's fees, the reviewing court should consider: (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal service properly; (2) the likelihood that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily

charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered. *See Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 818 (Tex.1997).

To determine whether an attorney's fee award is excessive, the reviewing court may draw upon the common knowledge of the justice of the court and their experiences as lawyers and judges. *See City of Fort Worth v. Groves*, 746 S.W.2d 907, 918 (Tex.App.—Fort Worth 1988, no writ). The trial court may award those fees that are reasonable and necessary for the prosecution of the suit. *See Sterling*, 822 S.W.2d at 10. We now review the evidence to determine whether the trial court's award of attorney's fees was reasonable.

In the instant case, Britton Monts, the attorney for Harmony, testified that he entered into a contingent fee contract with Harmony. Under the terms of the contract, Monts would be paid one-third of any recovery that Harmony obtained in this case. In the event of any appeal, the fee would be raised an additional 5%, or to 38 ⅓ %. Monts described the work he did in order to prepare for trial in this case. Specifically, Monts analyzed contracts and documents, talked to several experts, prepared the theory of the case, conducted discovery, traveled to Aquila's offices and met with Aquila's attorney, and took several depositions in Houston, San Antonio, and Austin. Monts spent at least 300 hours of his time working on this case.

Monts testified that Tom McCall, the other attorney for Harmony, spent at least 100 hours of time on this case. According to Monts, a safe estimate of time on this case would be 400 hours of time. If Monts were to charge an hourly rate, the reasonable and necessary hourly fee for his time and labor involved would be $250 an hour.

In addition, Monts testified that a fair amount for an appeal to the Court of Appeals would be $15,000. If the opposing party filed a petition for discretionary review to the Supreme Court of Texas, then Mont would charge a fee of $1,500 for this. If the Supreme Court agreed to hear the case, then another $3,500 would be added to the fee. Monts considered that a reasonable estimate to take the appeal all the way through the appellate system would be a total of $20,000.

Here, the jury awarded attorney's fees in the amount of $133,000, noting it as "in addition to" the contract damages awarded. Additionally, the jury awarded $20,000 for the appeal. Aquila failed to challenge Harmony's evidence on attorney's fees and did not offer any proof to rebut Monts's testimony. After viewing the evidence and taking into consideration the factors outlined in *Arthur Andersen*, we find that the record contains sufficient evidence to support the jury's award of $133,000 in attorney's fees. Accordingly, we overrule this issue.

### PREJUDGMENT INTEREST

In its sixth issue, Aquila complains that the trial court erred in granting Harmony prejudgment interest. Specifically, Aquila contends that the interest was calculated incorrectly and that the trial court awarded Harmony prejudgment interest during periods of delay that were caused by Harmony.

 Prejudgment interest is "compensation allowed by law as additional damages for lost use of the money due as damages during the lapse of time between the accrual of the claim and the date of judgment." *See Johnson & Higgins of Texas, Inc. v. Kenneco Energy, Inc.,* 962 S.W.2d 507, 528 (Tex.1998). The award of prejudgment interest during periods of delay is generally left to the discretion of the trial court. *See Helena Chemical Co. v. Wilkins,* 18 S.W.3d 744, 760 (Tex.App.—San Antonio 2000, pet. granted); *Lege v. Jones,* 919 S.W.2d 870, 876 (Tex.App.—Houston [14th Dist.] 1996, no writ). The trial court's decision in refusing to offset from its interest calculations periods of delay caused by a litigant is reviewed under the abuse of discretion standard. *See Wilkins,* 18 S.W.3d at 760. A trial court abuses its discretion if its action is arbitrary, unreasonable, and without reference to any guiding rules and principles. *See Goode v. Shoukfeh,* 943 S.W.2d 441, 446 (Tex.1997); *Wilkins,* 18 S.W.3d at 760. Because the offset is discretionary rather than mandatory, we do not substitute our opinion for that of the trial court. *See Wilkins,* 18 S.W.3d at 760; *City of Alamo v. Casas,* 960 S.W.2d 240, 260 (Tex.App.—Corpus Christi 1997, pet. denied).

Aquila argues that prejudgment interest for all damage suits is governed by chapter 304 of the Finance Code, and that the trial court calculated the prejudgment interest incorrectly. *See generally* Tex. Fin.Code Ann. §§ 304.102–.108 (Vernon Supp.2000). Although chapter 304 governs prejudgment interest in wrongful death, personal injury, and property damage cases, Aquila contends that the Supreme Court has adopted the same rules of calculation for prejudgment interest in all other cases.

*See Johnson & Higgins,* 962 S.W.2d at 531.

According to the Supreme Court in *Johnson & Higgins, Inc. v. Kenneco Energy, Inc.,* prejudgment interest begins to accrue on the earlier of (1) 180 days after the date the defendant receives written notice of a claim or (2) on the day the suit is filed. *See* Tex. Fin.Code Ann. § 304.104 (Vernon Supp.2000); *Johnson & Higgins,* 962 S.W.2d at 531. Prejudgment interest is calculated as simple interest. *See* Tex. Fin.Code Ann. § 304.104 (Vernon Supp. 2000); *Johnson & Higgins,* 962 S.W.2d at 532.

 On the other hand, Harmony argues that *Johnson & Higgins* does not apply to breach of contract cases where damages can be ascertained from the contract. *See Perry Roofing Co. v. Olcott,* 744 S.W.2d 929, 930 (Tex.1988); *Rio Grande Land & Cattle Co. v. Light,* 758 S.W.2d 747, 748 (Tex.1988). Harmony claims that prejudgment interest in this type of breach of contract case, where damages can be ascertained from the contract, is governed by section 302.002 of the Finance Code. We agree. Section 302.002 provides:

> When no specified rate of interest is agreed on by the parties, interest at the rate of six percent per year is allowed on all accounts and contracts ascertaining the amount payable, beginning on the 30th day after the date on which the amount is due and payable.

*See* Tex. Fin.Code Ann. § 302.002 (Vernon 1998) (formerly Tex.Rev.Civ. Stat. Ann. art. 5069–1.03 (Vernon 1987)).[1] A contract is "one ascertaining the sum payable" when it (1) provides the conditions upon which liability depends, and (2) fixes a measure by which the sum payable can be ascer-

---

**1.** This statute has since been revised and became effective September 1, 1999. *See* Act of May 10, 1999, 76th Leg., R.S., ch. 62, § 7.18, 1999 Tex. Gen. Laws 224 (current version at Tex. Fin.Code Ann. § 302.002 (Vernon Supp. 2000)).

tained with reasonable certainty, in the light of the attending circumstances. *See Great American Ins. Co. v. North Austin Mun. Util. Dist. No. 1,* 950 S.W.2d 371, 372–73 (Tex.1997); *Old Republic Sur. Co. v. Cross,* 27 S.W.3d 35, 38 (Tex.App.—San Antonio 2000, pet denied). Accordingly, section 302.002 applies when calculating prejudgment interest even if extrinsic evidence is needed to quantify contract damages so long as the contract fixes a measure by which the sum payable can be ascertained with reasonable certainty in light of the attending circumstances. *See Great American Ins.,* 950 S.W.2d at 373. To determine whether section 302.002 applies in this case, we consider the language of the contract.

▇▇ The contract provides:

11.2 The amount to be paid for all processing rights shall be eighty percent (80%) of the sum determined by aggregating the results obtained by multiplying the volume of each component plant product at each Point of Delivery hereunder attributable to Seller by the weighted average monthly sales price for each such component plant product.

. . . . .

11.3 The amount to be paid for residue gas well gas and residue casinghead gas shall be one hundred percent (100%) of the sum obtained by aggregating the results obtained by multiplying the quantity of residue gas well gas (in MMBTU) and residue casinghead gas (in MMBTU) at each Point of Delivery hereunder attributable to Seller by the appropriate price per MMBTU of residue gas well gas and residue casinghead gas.

The 1991 contract also contained detailed formulas to determine the price to be paid to Harmony for each specific type of liquid and residue gas. The provisions in the contract were utilized by Spillane when he calculated the damages. The damages were introduced into evidence and the jury awarded damages. In this case, the 1991 contract clearly provided a method for determining the extent of Aquila's liability in the event of Aquila's default. Accordingly, because the 1991 contract is a contract "ascertaining the sum payable," section 302.002 dictates the amount of prejudgment interest owed by Aquila. *See Great American Ins.,* 950 S.W.2d at 374.

The damages accrued on a monthly basis commencing in 1992 through 1998. After the verdict, Harmony had its expert take each monthly sum due under the contract and calculated interest at the rate of 6% per annum commencing 30 days after the date each such payment became due until the judgment. A separate calculation was performed for each month in which damages were sought and awarded by the jury. These calculations were then totaled to arrive at a prejudgment interest amount of $67,739.20, in accordance with section 302.002 of the Finance Code. The trial court then awarded Harmony this amount as prejudgment interest. As a result, we find that the trial court did not err in applying section 302.002 of the Finance Code to ascertain the amount of prejudgment interest.

▇▇ In addition, Aquila contends that the trial court erred in awarding Harmony prejudgment interest during periods of delay caused by Harmony, based on section 304.108 of the Finance Code. Section 304.108 provides that a court may order that prejudgment interest does not accrue during periods of delay in the trial court. *See* TEX. FIN.CODE ANN. § 304.108(a) (Vernon Supp.2000). A court shall consider periods of delay caused by a defendant and a claimant. *See id.* § 304.108(b). Yet, the statute does not mandate such offsetting, which is entirely within the discretion of the trial court. *See Wilkins,* 18 S.W.3d at

760; *Casas,* 960 S.W.2d at 260. Here, the record reflects that the trial court granted three motions for continuance. The first was filed by Aquila, the second was filed by Harmony, and the third was an agreed motion for continuance submitted by both parties. Accordingly, the trial court did not abuse its discretion when it did not abate the accrual of prejudgment interest.

Because the trial court did not abuse its discretion in calculating the prejudgment interest under section 302.002 of the Finance Code and refusing to abate the accrual of prejudgment interest during periods of delay, we overrule this issue.

## JNOV

On cross-appeal, Harmony complains that the trial court erred in granting Aquila's motion for JNOV on jury questions three (3) and four (4). Specifically, Harmony contends: (1) the record contains more than a scintilla of competent evidence to support the jury's findings that Aquila failed to honor an agreement to connect Harmony's Victory Wells to Aquila's pipeline system thereby causing lost profits damage to Harmony; (2) the evidence introduced at trial created fact issues on whether Aquila was contractually obligated to hook-up Harmony's Victory Wells to its pipeline system and whether breach of such an agreement caused lost profits damage to Harmony; (3) the trial court erred by finding as a matter of law that the parties did not have an agreement to hook-up the Victory Wells; and (4) the trial court erred by finding as a matter of law that Harmony was not entitled to recover lost profits. Question three (3) of the jury charge states:

Do you find from a preponderance of the evidence that Aquila and Harmony agreed in 1995 that Aquila would connect the Victory Wells to its pipeline and

then process the gas from the Victory Wells?

You are instructed that when Aquila sent the proposed 1995 contract (defendant's exhibit 13) to Harmony, and Harmony returned plaintiff's exhibit 18 with the additional terms [adding the Victory Wells to the agreement and modifying paragraph 19.6], the additional terms did not become part of the agreement if:

(1) they materially altered the original proposal, or

(2) Aquila had already objected to the additional terms, or objected to them within a reasonable time after learning about them.

The jury answered "yes" to question three (3) and then answered question four (4) regarding damages:

What sum of money, if any, do you find from a preponderance of the evidence represents Harmony's lost profits as a result of Aquila's failure to process gas from the Victory Wells from 1995 to the present time, pursuant to the agreement you have found in Question 3?

You are instructed that *lost profits* means the difference between the value of the gas from the Victory Wells which was not taken and the amount of the contract price.

In response to question four (4), the jury awarded Harmony lost profit damages in the amount of $200,000.

## A. *Standard of Review*

■■■■■■ A trial court may disregard a jury's findings and grant a motion for JNOV only when there is no evidence upon which the jury could have made its findings. *See Mancorp, Inc. v. Culpepper,* 802 S.W.2d 226, 227 (Tex.1990). To determine whether the trial court erred in granting a motion for JNOV, the appellate court must consider only the evidence and the reason-

able inferences that support the jury's answers. *See Best v. Ryan Auto Group, Inc.*, 786 S.W.2d 670, 671 (Tex.1990). The record is reviewed in the light most favorable to the jury's finding, considering only the evidence and inferences that support the finding and rejecting the evidence and inferences contrary to the finding. *See Navarette v. Temple Indep. Sch. Dist.*, 706 S.W.2d 308, 309 (Tex.1986). To uphold a JNOV, the appellate court must decide that no evidence supports the jury's findings. *See Mancorp*, 802 S.W.2d at 227–28; *Richardson v. Wal–Mart Stores, Inc.*, 963 S.W.2d 162, 164 (Tex.App.—Texarkana 1998, no pet.). The JNOV should be reversed when there is more than a scintilla of competent evidence to support the jury's finding. *See Rowe v. Rowe*, 887 S.W.2d 191, 195 (Tex.App.—Fort Worth 1994, writ denied).

## B. *Lost Profits*

In order to recover for lost profits, sufficient evidence must be presented to enable the jury to determine the net amount of profit with reasonable certainty. *See Texas Instruments Inc. v. Teletron Energy Management, Inc.*, 877 S.W.2d 276, 279 (Tex.1994); *Maxvill–Glasco Drilling Co., Inc. v. Royal Oil and Gas Corp.*, 800 S.W.2d 384, 386 (Tex.App.—Corpus Christi 1990, writ denied). While it is not necessary for lost profits to be established with certainty, evidence of lost profits must be based upon objective data from which the loss can be determined with a reasonable degree of exactness. *See Texas Instruments*, 877 S.W.2d at 279; *Southwest Battery v. Owen*, 131 Tex. 423, 426, 115 S.W.2d 1097, 1099 (1938); *Maxvill–Glasco*, 800 S.W.2d at 386;

Recovery of lost profits does not require that the loss be susceptible to exact calculation. *See Szczepanik v. First Southern Trust Co.*, 883 S.W.2d 648, 649 (Tex.1994) (per curiam); *Texas Instruments*, 877 S.W.2d at 279; *Howell Crude Oil Co. v. Donna Refinery Partners, Ltd.*, 928 S.W.2d 100, 107 (Tex.App.—Houston [14th Dist.] 1996, writ denied). What constitutes reasonably certain evidence of lost profits is a fact intensive determination. *See Texas Instruments*, 877 S.W.2d at 279; *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 84 (Tex.1992); *Howell*, 928 S.W.2d at 107. At a minimum, opinions or estimates of lost profits must be based on objective facts, figures, or data from which the amount of lost profits can be ascertained. *See Texas Instruments*, 877 S.W.2d at 279; *Howell*, 928 S.W.2d at 107. Recovery of lost profits must be predicated on one complete calculation. *See Texas Instruments*, 877 S.W.2d at 279; *Howell*, 928 S.W.2d at 107.

Recovery of lost profits will not be allowed where the facts show that the profits claimed are too uncertain or speculative. *See Southwest Battery*, 115 S.W.2d at 1099; *Memorial City Gen. Hosp. Corp. v. Cintas Corp. No. 81*, 679 S.W.2d 133, 137 (Tex.App.—Houston [14th Dist.] 1984, no writ). A business venture which is risky in prospect, i.e., one whose activities are dependent on uncertain or changing market conditions, chancy business opportunities, promotion of untested products or entry into unknown or unviable markets, or the success of a new and unproven enterprise, cannot recover lost profits. *See Texas Instruments*, 877 S.W.2d at 279; *International Bank of Commerce–Brownsville v. International Energy Dev. Corp.*, 981 S.W.2d 38, 49 (Tex.App.—Corpus Christi 1998), *cert. denied*, 528 U.S. 1137, 120 S.Ct. 982, 145 L.Ed.2d 932 (2000). Without objective facts, figures, and data from historical profitability, or evidence establishing the existence of future contracts, damages for lost profits are mere speculation. *See Allied Bank*

*West Loop, N.A. v. C.B.D. & Assoc., Inc.,* 728 S.W.2d 49, 55 (Tex.App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.).

 With the standard of review and applicable law in mind, we now examine the evidence to determine whether the jury's finding on lost profits is supported by more than a scintilla of competent evidence. Harmony offered the expert testimony and reports of James Spillane to show evidence of lost profits for Aquila's failure to hook-up the Victory Wells. On July 25, 1997, Spillane prepared a summary of his findings and then modified his report before trial. In explaining his report, Spillane testified he used standard methodologies to determine the economic loss that occurred to Harmony as a result of Aquila's failure to hook up the Victory Wells to its pipeline. The methodology Spillane used to produce his calculations was to: (1) look at surrounding wells that were applicable to this case to know what the ultimate recoveries could be; (2) know the cost of operating a well; (3) know the prices on the liquids and gas; (4) determine whether there was water in the well and the cost of removing the water; and (5) calculate the taxes. Further, Spillane had Glen Welch, a petroleum engineer, check his calculations.

Spillane testified that applying this methodology was not an exact science. According to Spillane, the problem here was trying to find out what the basis of a claim was because Harmony operated the Victory Wells 1 and 2 only one or two days a month to maintain its lease. By 1987, both Victory Wells were plugged and no longer producing. Spillane could not get his figures from the Railroad Commission reports because they did not reflect what the numbers would have been had the Victory Wells been continually producing oil and gas. Instead, Spillane obtained his initial figures from a well test that was done on the Victory Wells in 1985 to determine what the amount of the Victory Wells would have been if they had been continually producing oil and gas. Spillane then assumed daily production rates in 1987 and then declined the number by 20% each year and applied Aquila's price per MCFs to arrive at a gross revenue. Spillane testified he made a conservative estimate of the fair economic value of those wells as if they were producing wells. Spillane admitted that he did not know if the gas had been repleted into other zones or wells. Spillane estimated that the failure of Aquila to hook up the Victory Wells to the pipeline resulted in Harmony suffering damages in the amount of $267,813.67. This testimony shows that although Spillane used a standard methodology for determining lost profits, the underlying factual basis used to determine the extent of lost profits is merely speculative. Since Spillane's calculations are based on a well test done in 1985, there is no evidence of objective facts, figures, and data from historical profitability. As a result, we find that there is no evidence to support the jury's finding on lost profits.

Because we find there is no evidence of lost profits, we need not address whether there was more than a scintilla of competent evidence to show an agreement between Harmony and Aquila in 1995 that Aquila would connect the Victory Wells to its pipeline and then process the gas. *See* TEX.R. CIV. P. 301; *Brown v. Bank of Galveston Nat. Ass'n,* 963 S.W.2d 511, 513 (Tex.1998) (holding that a trial court may grant a JNOV if there is no evidence to support one or more of the jury's findings on issues necessary to liability). Accordingly, because the trial court properly granted JNOV on jury questions three (3) and four (4), we overrule all of Harmony's issues on cross-appeal.

Having overruled Aquila's issues on appeal and Harmony's issues on cross-appeal, we affirm the judgment of the trial court.