Appellees= Motion for Rehearing Overruled; Reversed and Rendered;
Opinion of June 6, 2006 Withdrawn and Substitute Opinion filed October 19, 2006








Appellees= Motion for Rehearing Overruled; Reversed and
Rendered; Opinion of June 6, 2006 Withdrawn and Substitute Opinion filed
October 19, 2006.                        

 

 

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-04-00433-CV

____________

 

RAMCO OIL & GAS LTD. AND RAMCO
ENERGY PLC,
Appellants/Cross-Appellees

 

V.

 

ANGLO-DUTCH (TENGE) L.L.C. AND
ANGLO-DUTCH PETROLEUM INTERNATIONAL, INC., Appellees/Cross-Appellants

 



 

On Appeal from the 61st
District Court

Harris County, Texas

Trial Court Cause No.
00-22588

 



 

 S U B S T I T U T E   O P I N I O N [1]








This case arises out of a business dispute over interests
in a foreign oil and gas field.  After a lengthy trial involving complicated
facts and extensive expert testimony, the trial court rendered judgment on the
jury=s verdict,
awarding plaintiffs/appellees/cross-appellants $6.4 million in lost profits,
plus attorney=s fees and interest, based on their breach-of-contract
claims against defendants/appellants/cross-appellees. The main issue on appeal
is whether the evidence proves with reasonable certainty the profits appellees
claim to have lost as a result of appellants= breaches of
contract.  We conclude that it does not.  We also conclude that the trial court
correctly granted summary judgment as to appellees= claims for breach
of fiduciary duty, misappropriation, and misappropriation of trade secrets. 
Accordingly, we reverse the trial court=s judgment and
render judgment that appellees take nothing against appellants.

                                                    I. 
Overview

Scott Van Dyke repeatedly tried without success to realize
his Adream and business
plan@ by purchasing the
equity of a company with development rights in a potentially lucrative oil and
gas field in Kazakhstan so that he could try to profitably develop this field. 
After learning that another company had acquired these development rights, Van
Dyke concluded that the purchaser acquired these rights by using confidential
information obtained in violation of confidentiality agreements.  Van Dyke=s companies filed
suit against the companies he believed had breached these agreements and
misappropriated confidential information and trade secrets. 

                        II. 
Factual and Procedural Background








In 1992,
Van
Dyke and appellee/cross-appellant Anglo-Dutch Petroleum International, Inc.
(hereinafter AAD International@), a Texas
corporation in which he was a principal, became involved in a group of
companies that sought to identify, evaluate, and determine the feasibility of
oil and gas opportunities in the former Soviet Union.  Sugarland Oil Company, a
Delaware corporation, was also a member of this group.  The group purchased
geological and geophysical data on a field in Kazakhstan known as the Tenge Field.  The Soviet
Union had produced gas from shallow horizons in the Tenge Field, and this data
showed potential oil horizons beneath the gas.  

After deciding that the possibilities in the Tenge Field
were worth pursuing, appellee/cross-appellant Anglo-Dutch (Tenge) L.L.C.
(hereinafter AAD Tenge@), a company in
which Van Dyke owned a ninety-percent interest, formed a Delaware limited
liability company named Tenge Development L.L.C. (hereinafter ATenge Development@).  Sugarland
(Kazakhtenge) L.L.C. (hereinafter ASugarland@), a Delaware
company, also owned an interest in Tenge Development.[2] 
Tenge Development, in turn, was  a member[3]
of Anglo-Dutch (Kazakhtenge) L.L.C. (hereinafter AKazakhtenge@), a Texas limited
liability company. Later, N.I.R. Tenge L.P. (hereinafter the AIsraeli Company@), an Israeli
limited partnership, and Overseas Petroleum and Investment Corporation
(hereinafter the ATaiwanese Company@), a Panamanian
corporation affiliated with the government of Taiwan, both provided capital and
became members of Kazakhtenge.  At all material times, Tenge Development served
as the administrative member of Kazakhtenge.  Although Van Dyke=s company AD Tenge
was the administrative member of Tenge Development and thus effectively the
administrative member of Kazakhtenge until May 1996, neither Van Dyke nor any
of his companies owned or controlled a majority interest in Tenge Development
or Kazakhtenge at any material time.  Lacking this ownership and control, Van
Dyke and his companies, on various occasions, attempted unsuccessfully to
acquire all of the interests in Tenge Development and Kazakhtenge.








In November 1993, Kazakhtenge and Mangistaumunaygaz
Production Association (hereinafter the AGas Production
Association@), a Kazakhstani association affiliated with the
Kazakhstan government, entered into a Foundation Agreement regarding the
creation of the Tenge Joint Enterprise (the AJoint Enterprise@), a Kazakhstani
joint enterprise.  Under this Foundation Agreement, which had a term of
twenty-five years, each party owned a fifty-percent interest.  The following
diagram shows the ownership interests in the Joint Enterprise as well as
Kazakhtenge=s relationship to the various entities vis-à-vis
the matters in dispute:[4]

                                                                                                                                                            




 
 
 
 
 




 

 

 

 

 

 

 

 

 

 

 

 

 








The purpose of the Joint Enterprise was to develop the
Tenge Field.  The Foundation Agreement and the Charter creating the Joint
Enterprise allowed the Joint Enterprise to develop and sell hydrocarbons
produced from the Tenge Field.  

In May 1997, appellant/cross-appellee Ramco Energy PLC
(hereinafter ARamco Energy@), a Scottish
company, signed a confidentiality agreement with Anglo-Dutch (Neftenge) L.L.C.
(hereinafter AAD Neftenge@) and examined the
possibility of becoming involved in the development of the Tenge Field.  In
June 1997, Ramco Energy decided not to pursue this matter.

Three months later, in August 1997,
appellant/cross-appellee Ramco Oil & Gas, Ltd. (hereinafter ARamco Oil@), a Scottish
company, learned that Halliburton Energy Services, Inc. (hereinafter AHalliburton@) was reviewing
the Tenge Field prospect.  Having worked with Halliburton in developing other
opportunities in Central Asia, Ramco Oil decided to examine the possibility of
becoming involved in the development of the Tenge Field with Halliburton. 
Ramco Oil and Halliburton signed an agreement delineating the terms of their
relationship. 

On November 26, 1997, Ramco Oil and Halliburton entered
into a Letter of Intent with AD Tenge and Anglo-Dutch (Jersey) Limited
(hereinafter AAD Jersey@),[5]
a Channel Islands company, detailing, among other things, an approach to
purchasing interests in Tenge Development and Kazakhtenge.  The Letter of
Intent was subject to many conditions, including approvals of executive
management and, if necessary, Ramco Oil=s and Halliburton=s boards of
directors.  The Letter of Intent incorporated the terms of the May 1997
confidentiality agreement signed by Ramco Energy and stated that the terms of
this agreement shall apply mutatis mutandis (Aall necessary
changes having been made@), as if Ramco Oil had entered into the
same agreement with AD Tenge.  








Pursuing development of the Tenge Field necessarily would require
interface and dealings with the government of Kazakhstan.  To obtain expertise
and assistance in this regard, Ramco Oil and Halliburton retained as a
consultant Golden Eagle Partners (AGolden Eagle@), which had
experience in communications and relations with the Kazakhstan government.  For
business reasons unrelated to the Tenge Field, Halliburton formally withdrew
from the Letter of Intent in July 1998.  Ramco Oil withdrew as well in November
1998.  

AD Tenge and AD International (hereinafter collectively
referred to as APlaintiffs@) and Van Dyke
continued to seek to purchase the interests of the Tenge Development and
Kazakhtenge members not affiliated with Plaintiffs.  Golden Eagle and Central
Asia Industrial Investments, N.V.  (hereinafter ACentral Asia@),[6]
a Netherlands Antilles company, also negotiated with the Tenge Development and
Kazakhtenge members. On March 8, 2000, Kazakhtenge entered into a purchase
agreement with Central Asia, under which it agreed to sell Central Asia all of
the shares in a company to which Kazakhtenge would transfer all of its interest
in the Joint Enterprise.  Central Asia paid $2 million in cash at the closing
of this purchase and agreed to future payments conditioned on future
production.  








Plaintiffs filed this suit against Halliburton, Ramco
Energy, Ramco Oil, and others, alleging breach of contract and various torts. 
Plaintiffs claimed that, in breach of their obligations to keep the information
about the Tenge Field confidential, Halliburton, Ramco Energy, and Ramco Oil
disclosed confidential information concerning the Tenge Field to Golden Eagle,
which Golden Eagle and Central Asia then used for their own benefit. 
Plaintiffs later nonsuited some of their tort claims, and the trial court
granted two motions for summary judgment filed by Ramco Energy and Ramco Oil
(hereinafter the ARamco Parties@), dismissing all
Plaintiffs= remaining tort claims against the Ramco Parties. 
Plaintiffs went to trial on their breach-of-contract claims against
Halliburton, Ramco Energy, and Ramco Oil.  Plaintiffs asserted that these
defendants breached their contractual confidentiality obligations, allegedly
resulting in Central Asia=s acquisition of Kazakhtenge=s interest in the
Joint Enterprise.  Plaintiffs claimed that, but for theses breaches, they would
have purchased the  Kazakhtenge members= interest,
developed the Tenge Field, and earned $640 million in profits by 2018, the end
of their agreement with the Gas Production Association. 








          After
a trial lasting more than six weeks,[7]
the jury rendered its verdict, awarding Plaintiffs $64 million in lost profits
for Halliburton=s breach of its confidentiality agreement
and $6.4 million in lost profits for the Ramco Parties= breaches of their
confidentiality agreements.  The jury also determined that Halliburton and
Ramco[8]
were partners regarding the Tenge Field project.  The Ramco Parties filed a
motion for judgment notwithstanding the verdict, and the trial court denied
their motion except as to the jury=s partnership
finding, which it set aside.  Otherwise, the trial court rendered judgment on
the jury=s verdict,
awarding Plaintiffs $6.4 million in lost profits on their contract claims
against the Ramco Parties, as well as attorney=s fees,
prejudgment and postjudgment interest, and court costs.[9] 
The Ramco Parties subsequently filed this appeal.  Plaintiffs filed a
cross-appeal, challenging, among other things, the trial court=s summary judgment
in favor of the Ramco Parties as to Plaintiffs= claims for breach
of fiduciary duty, misappropriation, and misappropriation of trade secrets.

III.   Issues Presented 

The Ramco Parties assert the
following issues on appeal:

(1)     Did the trial court err in admitting the
testimony of Plaintiffs= experts George Schaefer and John
Brickhill? 

(2)     Is there evidence proving with reasonable
certainty Plaintiffs= lost profits?

(3)     As to Ramco Energy=s liability, can Plaintiffs enforce
the May 1997 confidentiality agreement between Ramco Energy and AD Neftenge?

(4)     Did the trial court reversibly err in
charging the jury on the Ramco Parties= liability?

(5)     Is the evidence legally and factually
sufficient to support the jury=s liability findings against the Ramco Parties?

(6)     Are the
Ramco Parties liable for attorney=s fees?

In their cross-appeal, Plaintiffs assert the following
issues: 

(1)     Did the trial court err in granting judgment
notwithstanding the verdict on the partnership issue?

(2)     Did the trial court err in granting summary
judgment on the Plaintiffs= claims for breach of fiduciary duty, misappropriation, and
misappropriation of trade secrets?

(3)     Did the trial court err in denying
postjudgment interest on attorney=s fees?

(4)     Did the trial court err in denying
prejudgment interest on future damages?

(5)     Was the
trial court=s use of a five percent prejudgment and postjudgment
interest rate based on an invalid statute?

 








IV.   Analysis

A.     Plaintiffs= Proof of Lost
Profits as Damages on Their Contract Claims

The main issue on appeal arises out of
Plaintiffs= contract claims.  In construing contracts, our primary
concern is to ascertain and give effect to the intentions of the parties as
expressed in the contract.  Kelley‑Coppedge, Inc. v. Highlands Ins. Co.,
980 S.W.2d 462, 464 (Tex. 1998).  To ascertain the parties= true intentions,
we examine the entire agreement in an effort to harmonize and give effect to
all provisions of the contract so that none will be rendered meaningless.  MCI
Telecomms. Corp. v. Tex. Utils. Elec. Co., 995 S.W.2d 647, 652 (Tex.
1999).  Whether a contract is ambiguous is a question of law for the court.  Heritage
Res., Inc. v. NationsBank, 939 S.W.2d 118, 121 (Tex.  1996).  A contract is
ambiguous when its meaning is uncertain and doubtful or is reasonably
susceptible to more than one interpretation.  Id.  However, when a
written contract is worded so that it can be given a certain or definite legal
meaning or interpretation, it is unambiguous, and the court construes it as a
matter of law.  Am.  Mfrs. Mut. Ins. Co. v. Schaefer, 124 S.W.3d 154, 157
(Tex. 2003).

In reviewing the denial of the Ramco
Parties= motion for
judgment notwithstanding the verdict, we must consider the evidence in the
light most favorable to the challenged finding and indulge every reasonable
inference that would support it.  See City of Keller v. Wilson, 168
S.W.3d 802, 821 (Tex. 2005). We must credit favorable evidence if a reasonable
factfinder could do so and disregard contrary evidence unless a reasonable
factfinder could not.  See id. at 827. 








Under their third issue, the Ramco Parties assert the trial
court erred in denying their motion for judgment notwithstanding the verdict
because the evidence does not prove with reasonable certainty the profits
Plaintiffs claim to have lost as a result of the Ramco Parties= breaches of
contract.  A party seeking to recover lost profits on a breach-of-contract
claim  must prove the loss with reasonable certainty.  Tex. Instruments,
Inc. v. Teletron Energy Mgm=t, Inc., 877
S.W.2d 276, 279 (Tex. 1994).  Evidence of lost profits must not be
uncertain or speculative.  Id.  Whether evidence of lost profits is
speculative depends upon the facts and circumstances of each particular case. 
Id. 

Profits are not required to be exactly calculated; it is
sufficient that there be data from which they may be ascertained with a
reasonable degree of certainty and exactness.  Id.  Opinions or
estimates of lost profits must be based on objective facts, figures, or data
from which the amount of lost profits may be ascertained.   Szczepanik v.
First S. Trust Co., 883 S.W.2d 648, 649 (Tex. 1994).   Plaintiffs cannot
recover profits that are largely speculative, such as activities dependent on
uncertain or changing market conditions, chancy business opportunities,
promotion of untested products, entry into unknown or unviable markets, or on 
the success of new and unproven enterprises.  Id.  Factors like these
and others that make a business venture risky preclude a retrospective recovery
of lost profits.  Id.   If the business is shown to have been already
established and profitable when the contract was breached, such pre‑existing
profit, together with other facts and circumstances, may indicate with
reasonable certainty the amount of profits lost.  Id. 

Is there evidence that proves Plaintiffs= lost profits with
reasonable certainty? 








The jury found that Plaintiffs suffered $6.4 million in
lost profits resulting from the Ramco Parties= breaches of their
confidentiality agreement.  The only actual damages awarded to Plaintiffs
against the Ramco Parties were these lost-profits damages.  The jury 
ultimately found that, as a natural, probable, and foreseeable result of
Halliburton=s and the Ramco Parties= breaches, Central
Asia was able to purchase Kazakhtenge=s interest in the
Joint Enterprise.  Plaintiffs assert that, absent these breaches,  Plaintiffs
would have been able to (1) buy the Taiwanese Company=s and Tenge
Development=s interests in Kazakhtenge, (2) develop the Tenge
Field in accordance with their expert=s production plan,
(3) produce and market more than 100 million barrels of oil and 911 billion
cubic feet of gas from the Tenge Field, and (4) generate substantial revenues
and profits for Plaintiffs after deducting the expenses and costs of
financing.  Under Plaintiffs= lost-profits damage model, (1) Plaintiffs
would have been able to purchase the Taiwanese Company=s and Tenge
Development=s interests in Kazakhtenge in accordance with the
regulations governing Kazakhtenge (hereinafter AKazakhtenge
Regulations@); (2) Plaintiffs would have obtained financing to
purchase these interests; (3) Plaintiffs would have obtained financing allowing
them to drill 96 wells in the Tenge Field without losing any of their 100%
equity interest in Kazakhtenge; and (4) the Tenge Field would have been highly
productive and profitable. 

                                                 Plaintiffs= Experts

Plaintiffs= evidence of damages came primarily from
the testimony of two experts, John Brickhill, the leader of a team that
performed an economic analysis of the Tenge Field, and George Schaefer, a
petroleum engineer and member of the same team that Plaintiffs  hired to do a
projection of production from the Tenge Field. 

                                              Schaefer=s Testimony

Schaefer worked for ten months projecting the Tenge Field=s production,
using data that Anglo Dutch provided him.[10] 
Schaefer determined that the Tenge Field, which measures approximately 19
square miles,  had 717 million barrels of oil and 1.7 trillion cubic feet of
gas below the surface.  Schaefer and his staff, making allowances for
cost-effectiveness and the technology available in the late 1990s, calculated
the following projections for total oil and gas production from the third
quarter of 2000 through the end of 2018:

!       137.9 million barrels of oil, or 19% of the
Tenge Field=s oil

!       911 billion cubic feet of gas, or 55% of the
Tenge Field=s gas

 

Schaefer=s production plan called for the
use of gas injection wells to increase oil production by pressurizing the oil. 
Under this production plan, 96 wells would be used to produce oil and gas as
follows:








! 10 reworked vertical wells

! 24 new vertical wells

! 40 new horizontal wells

! 11 new horizontal gas injector wells

! 11 new horizontal
water injector wells

Schaefer=s plan designates
the location of these wells where he believed recovery would be maximized.
Under this plan, oil would be produced for the first ten years, followed by gas
production through the end of the term. 

Schaefer testified that, in conducting his analysis, he
followed Astandard operating procedure in our business@ and calculated
what he believed could be produced if the Tenge Field were developed.  Schaefer
calculated the oil-recovery factor for the life of the Tenge Field to be 26%,
with 19% (137.9 million barrels) recovered in the first nineteen years. 
Schaefer based his gas-production profile on the 725 billion cubic feet of gas
the Soviets produced from the shallower horizons. 

                                               Brickhill=s Testimony

Brickhill testified that he had worked in the field of
economic analysis since 1969.  According to Brickhill, there are generally
accepted methods used in the oil and gas industry to calculate an oil field=s value, and his
team used industry-accepted methods in its economic analysis of the Tenge
Field, though he had never been to Kazakhstan, where the Tenge Field is
located.  Brickhill  testified that the steps for calculating the oil field=s value are to
project (1) revenues, (2) likely expenses, (3) field income, (4) the client=s share of the
field income, (5) the client=s share of lost profits, and (6) the
discounted present value of that projected profit stream. Brickhill=s team calculated
oil and gas revenues for 2000 through 2018, when the initial term of
Kazakhtenge=s agreement with the Gas Production Association was to
expire.  In his analysis, Brickhill relied on Schaefer=s oil revenue
calculations. 








Brickhill=s team calculated that, if both oil and
gas were produced, then 137.9 million barrels of oil could be generated from
the Tenge Field between 2000 and 2018.  If only oil were produced, the field
would yield 171.0 million barrels of oil during this time frame.[11] 
Explaining his calculations, data use, and methodology, Brickhill testified as
follows: 

!       In calculating the price of oil, he used the
historical price for past periods.  For future production, he primarily relied
on the United States Department of Energy=s forecasts of the price of oil.  

!       He calculated revenues by multiplying the
number of oil barrels by the price per barrel of oil.  

!       The Tenge Field would generate oil revenues
totaling $3.682 billion through 2018, based on the production of both oil and
gas.

!       The Tenge Field would generate oil revenues
totaling $4.755 billion through 2018, based on the production of only oil.

!       In
calculating gas revenues, Brickhill developed an independent forecast for the
price of gas, using a price of $2.42 per thousand cubic feet (Amcf@) of gas.  He
multiplied this price by 911,000,000 mcf, which is the amount of gas Schaefer
believed would be produced from the Tenge Field.

Brickhill calculated that, if both oil and gas were
produced from the Tenge Field, the total gross oil and gas revenues through
2018 would be $5.895 billion. Explaining his analysis, Brickhill testified that
the fact that Halliburton=s and Ramco=s calculations
were close to those of his team made him even more confident in his team=s numbers.








Brickhill calculated that the total expenses would be
$2.315 billion.[12]  
By subtracting expenses from revenues, Brickhill calculated the Afield income@ as $3.58
billion.   He divided this number in half to reflect the Gas Production
Association=s 50% share, which leaves $1.79 billion.  Brickhill
concluded that $2 million would be needed for Anglo Dutch to acquire interests
in Kazakhtenge.  He noted that in 2000, Anglo Dutch had tried to Abuy out@ the parties
owning interests in Kazakhtenge.  Brickhill referred to these parties as Aold investors,@ the major one
being the Taiwanese Company.[13]


Brickhill explained that to finance Anglo Dutch=s buyout of the Aold investors@ and its
development of the Tenge Field, Anglo Dutch would have to obtain financing from
new investors.  Brickhill set the costs of this financing at 25% of Kazakhtenge=s share of the
field income, which he calculated as $447.5 million.  Brickhill stated that
this cost figure was  probably too high but he did not want to overstate the
damages.  Brickhill estimated that, at a ten percent discount rate, $140 to $200
million in outside financing could be attracted.  He anticipated that Shell,
Citibank, Lukoil, or Van Dyke=s brother-in-law would provide this Anew investor@ financing. 
Brickhill testified that, after subtracting this $447.5 million, Anglo Dutch=s share of the
lost profits for the nineteen-year term would be $1.3 billion.  Brickhill=s team calculated
the present value of the stream of lost profits at $640 million.          








Brickhill stated that his model reflects that Van Dyke
would have had the $22.8 million necessary to acquire the Kazakhtenge members= interests. 
Although Brickhill said during his deposition that he assumed Van Dyke would be
able to buy out all of the Kazakhtenge members,[14]
by the time he testified at trial, Brickhill had seen a document suggesting
that Van Dyke would have been able to acquire all of these interests.  This
document is a February 8, 2000 e-mail from Fred Tresca of Golden EagleCa person not
affiliated with any of the Kazakhtenge members.  Brickhill testified that, in
this e-mail, Tresca told Lee Henkel, a lawyer for the Taiwanese Company, that
Tresca understood that the Taiwanese Company and others had accepted or were
about to accept Van Dyke=s offer.  Brickhill believed that,
although Van Dyke=s November 29, 1999 offer was rejected
initially, the same offer was later accepted in February 2000.[15]


Brickhill did not dispute that Plaintiffs= damage model
depends on Van Dyke=s ability to obtain financing and buy out
the Kazakhtenge members.  If Van Dyke could not acquire the interests of these
members, there would be no lost profits.  Brickhill=s model also
assumes Van Dyke would get the approximately $14 million from outside investors
needed to start production, without which,  Brickhill acknowledged, Van Dyke
would have no lost profits. 

Although Brickhill was not aware of any commitments from lenders
who would advance the $14 million to start production, he claimed he had seen
indications that Citibank, Shell, or Lukoil would lend Van Dyke these funds. 
Brickhill testified that it would be Aridiculous@ to assume that
Van Dyke would be unable to obtain any financing because Van Dyke=s brother-in-law
had said he would lend Van Dyke $2 million.  Furthermore, Brickhill testified
that he believed Van Dyke could have bought out the Kazakhtenge members by
paying only $220,000 up front, plus additional payments later.  According to
Brickhill, Van Dyke=s Adream and business
plan@ was to obtain
control of Kazakhtenge by buying the Taiwanese Company=s 66.5% interest
and then to produce and market the Tenge Field=s oil and gas.    








         
Under Brickhill=s model for oil and gas production in the
Tenge Field, there would be no gas production for the first ten years and
therefore no gas revenue to help fund development of the field.  If the oil
wells in the first ten years did not produce enough oil to pay for field
development, then there would be no profits because the field would not produce
oil in sufficient quantities to pay for the development of the field.  Without
oil revenues, there would be no funds to continue development of the field. 
Likewise, if the gas could not be produced economically and sold profitably,
then continued development of the gas wells would cease.

Brickhill candidly admitted that he did not know about the
state of Van Dyke=s relationship with the other Kazakhtenge
members and did not independently investigate whether those Kazakhtenge members
would have agreed to sell Van Dyke their interests. Van Dyke did not tell
Brickhill that his relationship with the Kazakhtenge members had been Avery rough@ over the years. 
Brickhill testified that, even if some Kazakhtenge members disliked Van Dyke,
Anglo Dutch only needed to have purchased the Taiwanese Company=s interest because
that would have provided Anglo Dutch with a majority, controlling interest in
Kazakhtenge.  Brickhill acknowledged that section 11.01 of the Kazakhtenge
Regulations provides that transfers of interests in Kazakhtenge must be
approved by all Kazakhtenge members, rather than by a vote of the holders of a
majority of the interests in Kazakhtenge.  However, he later testified that he
believed Plaintiffs could have bought the Taiwanese Company=s interest in
Kazakhtenge without the members= consent if the Taiwanese Company had
assigned all of its rights to distributions to Plaintiffs under section 11.02
of the Kazakhtenge Regulations and agreed to always cast its vote in
Kazakhtenge matters as directed by Plaintiffs.[16]








Brickhill was aware that Orrin Hein (who was administrative
member of Sugarland at the time of trial) had made statements that his company
would not accept any offer from Van Dyke based on any kind of contingency
payment.  Nothing that Brickhill saw in his work on this case led him to
believe that Tenge Development would sell Van Dyke its interest in Kazakhtenge,
and Van Dyke did not tell Brickhill that he believed Tenge Development would
sell him its interest in Kazakhtenge.  Rather, Van Dyke told Brickhill that he
could obtain a majority of the interests in Kazakhtenge, and Brickhill believed
him.   However, Brickhill knew of no documentation in which Sugarland indicated
it would vote for and agree to Plaintiffs= purchase of the
Taiwanese Company=s interest in Kazakhtenge.

       Tenge Development=s Approval as a Prerequisite to
Plaintiffs= Purchase 

                                        of
the Kazakhtenge Interests

In arguing that the evidence of lost profits is speculative
and not reasonably certain, the Ramco Parties assert that, even if Central Asia
had not purchased Kazakhtenge=s interest in the Joint Enterprise, Tenge
Development would not have approved Plaintiffs= purchase of any
member=s interest in
Kazakhtenge.  Plaintiffs argue that Tenge Development=s approval was not
necessary.  Therefore, we examine whether Plaintiffs needed Tenge Development=s approval.

First, we note that Brickhill was inconsistent as to whose
interest in Kazakhtenge the Plaintiffs would have needed to purchase.  On
direct examination, Brickhill testified that Plaintiffs= damage model was
based on Plaintiffs= owning all of Kazakhtenge=s equity.  He
projected that, to accomplish this acquisition of interests, Plaintiffs would
purchase the interests of the Aold investors@ in Kazakhtenge.  
Although the only entity Brickhill mentioned by name as an Aold investor@ was the Taiwanese
Company, Brickhill=s calculations were based on Plaintiffs= owning all of the
equity, meaning Plaintiffs would have had to acquire both the Taiwanese Company=s and Tenge
Development=s interests in Kazakhtenge. 








          Tenge
Development=s approval obviously would have been required to
purchase its interest; however, on redirect examination, Brickhill testified
that part of Van Dyke=s Adream and business
plan@ was to obtain
control of Kazakhtenge by purchasing only the Taiwanese Company=s interest in
Kazakhtenge.  Although Brickhill did not change his damage model to allow for
payments of profits to Tenge Development as a continuing member of Kazakhtenge,
Brickhill asserted on redirect examination that the Taiwanese Company was the
only Aold investor@ whose interest
Plaintiffs needed to acquire to obtain control over Kazakhtenge.  Brickhill
indicated that Plaintiffs could have obtained approval of their purchase of the
Taiwanese Company=s 66.5% interest by having the Taiwanese
Company cast a majority vote in favor of the purchase. To evaluate this part of
Brickhill=s testimony regarding the purchase of only the
Taiwanese Company=s interest, we first determine whether
Plaintiffs needed Tenge Development=s approval to buy
only the Taiwanese Company=s interest in Kazakhtenge.  

The unambiguous language of the Kazakhtenge Regulations
shows that Tenge Development=s approval would have been required
because unanimous approval of all Kazakhtenge members is necessary for the
assignment of any or all of a member=s interest:

11.01 Requirements Applicable to
Assignment

No assignment of all or any portion
of a Member=s Interest, other than those provided for in Section
4.05, shall be valid or permitted unless approved by a unanimous vote of the
other Members.  No assignee of any Interest of a Member shall have any rights
in and under the Regulations, the Foundation Agreement and Charter, or the
Tenge Field unless or until such assignment is approved and such assignee
expressly undertakes in writing, in a form satisfactory to all of the
non-assigning Members, to perform the obligations of the assignor, and provides
any parent guarantees or other assurances, plus reimbursement of any
transactional costs as all of the non-assigning Members may determine to be
necessary.

Because
section 4.05 would not have applied, under section 11.01 of the Kazakhtenge
Regulations, Plaintiffs would have needed Tenge Development=s approval before
purchasing the Taiwanese Company=s interest in Kazakhtenge.









When confronted with the Kazakhtenge Regulations, Brickhill
admitted that section 11.01 requires members= unanimous
approval for assignments of interests in Kazakhtenge.  However, Brickhill later
testified that he believed Plaintiffs could have acquired the Taiwanese Company=s interest without
Tenge Development=s approval by having the Taiwanese Company
(1) assign all of its rights to Kazakhtenge distributions to Plaintiffs under
section 11.02 of the Kazakhtenge Regulations and (2) agree to always cast its
vote in Kazakhtenge matters as directed by Plaintiffs.  Section 11.02 of the
Kazakhtenge Regulations reads, in pertinent part, as follows:

11.02 Assignment of Rights to Distributions and
Mortgage of Interest 

A Member may assign all or a
portion of its rights to Distributions, and may mortgage, pledge or otherwise
encumber all or part of its Interest, without having first to obtain any
approvals from the other Members, provided that: (i) such Member shall continue
to exercise control of the vote associated with its Interest and shall remain
liable for all obligations relating to such Interest. . . 








Under the unambiguous language of the Kazakhtenge
Regulations, the Taiwanese Company and Plaintiffs, as a matter of law, could
not have used section 11.02 to avoid the need for Tenge Development=s approval if, as
posited by Brickhill, the Taiwanese Company would be contractually obligating
itself to vote as directed by Plaintiffs.  This voting agreement would violate
the Taiwanese Company=s obligation to Acontinue to
exercise control of the vote associated with its Interest,@ as required by
section 11.02.[17] 
Therefore, we conclude that section 11.02 would not have provided a means by
which Plaintiffs could have circumvented the requirement of Tenge Development=s approval of
Plaintiffs= purchase of the Taiwanese Company=s interest.[18] 


In sum, under the unambiguous language of the Kazakhtenge
Regulations, as a matter of law, Tenge Development=s approval would
have been required for any sale of the Taiwanese Company=s interest in
Kazakhtenge to Plaintiffs.  Brickhill testified that Sugarland did not mention
this need for Tenge Development=s approval in its correspondence; however,
Sugarland=s omission does not change or waive the unambiguous
language of the Kazakhtenge Regulations requiring such approval.  Brickhill
also testified that it would make no sense for the Taiwanese Company to have
agreed to a unanimous-approval requirement for such transactions and that he
did not believe the Taiwanese people who run the Taiwanese Company are Astupid.@  Regardless of
Brickhill=s views and the Taiwanese Company=s folly or wisdom
in agreeing to the Kazakhtenge Regulations, these regulations have not been
challenged or set aside, and we must give force to their unambiguous language
as written.  See Schaefer, 124 S.W.3d at 161B62.  We cannot
rewrite the relevant provisions under the guise of interpretation.  See id.


           Evidence
that Tenge Development Would Have Approved Plaintiffs= 

                          Purchase of the Taiwanese
Company=s Interest








Brickhill testified that Plaintiffs= damage model
depends on Van Dyke=s ability to acquire the Kazakhtenge
members= interests. 
Brickhill agreed that, without such a buyout, there would be no lost profits. 
As discussed above, Tenge Development needed to approve the purchase by
Plaintiffs of any interest in Kazakhtenge, whether the interest in question was
the Taiwanese Company=s or Tenge Development=s.  Therefore,
Plaintiffs= damage model depends on Tenge Development=s approval for
Plaintiffs= purchase of at least the Taiwanese Company=s interest in
Kazakhtenge, if not the other interests.  However, the evidence that Tenge
Development would have approved such a purchase is speculative at best.

To put this issue in context, it is helpful to consider the
prior dealings among the members of Tenge Development and the resulting
friction in their relationship.  Sugarland became the administrative member of
Tenge Development on June 4, 1996.  At all material times, Tenge Development
was the administrative member of Kazakhtenge, which was the operator of the
Joint Enterprise.  Sugarland took over this position after AD Tenge was
terminated as the administrative member of Tenge Development.  Orrin Hein of
Sugarland testified that AD Tenge was terminated as administrative member
because (1) the other members had lost confidence in Van Dyke, (2) they no
longer trusted Van Dyke=s business judgment, (3) AD Tenge had
sought reimbursement for alleged expenditures without necessary backup data,
and (4) AD Tenge had entered into a confidentiality agreement that prevented
third parties from disclosing information to the other members.  Hein stated
that, on behalf of AD Tenge, Van Dyke had refused to accept AD Tenge=s termination as
administrative member, forcing the members into arbitration.  The arbitrator
confirmed AD Tenge=s removal as the administrative member of
Tenge Development and its replacement by Sugarland.  








In 1997, there was another arbitration between AD Tenge and
the other members of Tenge Development.  In that proceeding, the arbitrator
determined that AD Tenge had breached its fiduciary duty to Tenge Development
and the other members of Tenge Development by usurping a business opportunity
belonging to Tenge DevelopmentCthe chance to acquire part of the Israeli
Company=s interest in
Kazakhtenge after the Israeli Company decided it no longer wished to fund
future Kazakhtenge cash calls.  AD Tenge had given this business opportunity to
its affiliate AD Neftenge rather than to Tenge Development.  As a remedy for AD
Tenge=s breach of
fiduciary duty, the arbitrator placed AD Neftenge=s interest and
membership in Kazakhtenge in a constructive trust for Tenge Development=s economic and
voting benefit.  The arbitrator also ruled that after July 14, 1997, Tenge
Development would exercise all rights, including voting rights, of AD Neftenge
as a member of Kazakhtenge.

In light of this history marked by conflict and discord
between Sugarland (the administrative member of Tenge Development) and Van
Dyke, and given that some of the compensation in any deal would come from
future payments conditioned on the profitability of the Joint Enterprise and
Kazakhtenge, it is not surprising that there is evidence in the record that
Sugarland took a dim view of Van Dyke.  Hein testified that a contingent payout
from Van Dyke was highly speculative because Van Dyke already had spent $16
million and Agotten nowhere,@ and he had Aabsolutely no
confidence that [Van Dyke] could spend more money and get anywhere.@  In fact, Tenge
Development rejected a March 8, 2000 offer from a company controlled by Van
Dyke, even though the offer=s terms were substantially similar to
those of Central Asia=s successful offer.  Hein explained that
this offer was rejected because of a lack of confidence and trust in Van Dyke
and a conclusion that an arm=s length transaction with a reputable
party like Central Asia was a better alternative.  








Brickhill acknowledged that he had not seen any
documentation in which Sugarland indicated it would vote for and agree to
Plaintiffs= acquisition of the Taiwanese Company=s interest in
Kazakhtenge.  Brickhill also stated that nothing he had read in his work on
this case led him to believe that Tenge Development would sell its interest in
Kazakhtenge to Plaintiffs.  According to Brickhill, Van Dyke himself never
stated a belief that Tenge Development would sell him its interest in
Kazakhtenge, although he told Brickhill that he could obtain a majority
interest in Kazakhtenge.  Brickhill testified that he did not know about the
state of Van Dyke=s relationship with the other Kazakhtenge
members in 2000.  During his deposition, Brickhill said he assumed Van Dyke
would have been able to buy out all of the Kazakhtenge members; however, at
trial Brickhill stated that he had seen the February 8, 2000 e-mail from Fred
Tresca of Golden Eagle to Lee Henkel, which Brickhill believed indicated the
members would have sold Plaintiffs their interests.  The e-mail=s entire body
reads as follows:

I had a relatively long conversation with [Mingson Juang of the Taiwanese
Company].  I advised that we were happy to meet in Taipei if that facilitated
coming to an agreement.  I also reiterated that they are free to propose
ongoing participation by [the Taiwanese Company] if so desired.

One comment that I did not quite understand was that Mingson mentioned
that the his [sic] Board has already approved a level of payments based on an
earlier offer from Van Dyke and that our offer did not meet with the Boards
[sic] earlier levels [sic] of approval.  What does this mean?

I requested that if at all possible we would like comments back on our
proposal before Friday as we do not want to show up in Istanbul simply to
receive comments with no opportunity to reach an agreement.

He said that they would be meeting
tomorrow to discuss our offer.  Your input before that meeting could be
helpful.

Although it may be unclear exactly what Mingson Juang was
telling Tresca, several things are apparent.  The e-mail does not involve an
officer or agent of Tenge Development or Sugarland, and nothing in this short
communique involves or refers to Tenge Development or Sugarland.   Nothing
addresses whether Tenge Development or Sugarland would have approved Plaintiffs= purchase of the
interest of any Kazakhtenge member.  Furthermore, this e-mail does not state
that the Taiwanese Company had accepted an offer from Van Dyke.  If it had
accepted Van Dyke=s offer, the Taiwanese Company would not
have been in negotiations with Central Asia and Golden Eagle.  In the context
of those negotiations, the Taiwanese Company told Golden Eagle that its latest
offer was less than a Alevel of payments@ that the
Taiwanese Company=s board previously had decided was a
necessary part of an acceptable offer when considering an earlier offer from
Van Dyke.  In sum, this e-mail is not an objective fact or reasonably certain
basis for concluding (1) Sugarland or Tenge Development would have approved
Plaintiffs= purchase of the interest of any Kazakhtenge member or
(2) the Taiwanese Company had accepted one of Van Dyke=s offers.








Brickhill admitted that he did not independently
investigate whether the Kazakhtenge members would have approved of Plaintiffs= acquisition of
the interests of the Kazakhtenge members.  He stated that Abluster and
intimidation@ can be a negotiation tactic to try to get a better
deal.  Brickhill also referred to letters from Sugarland in April and May of
1999 that have a more conciliatory tone and that discuss the possibility of the
acquisition by one of Van Dyke=s companies of Tenge Development=s interest in
Kazakhtenge or Kazakhtenge=s interest in the Joint Enterprise.[19] 


Although it is possible that Tenge Development would have
approved Plaintiffs= purchase of either or both of the
Taiwanese Company=s or Tenge Development=s interests in
Kazakhtenge, or Kazakhtenge=s interest in the Joint Enterprise, the
evidence does not show a reasonable certainty that any such approval would have
been obtained.  Brickhill=s testimony that the transaction would
have occurred is speculative and based on an irrelevant document, the e-mail
from Tresca.  See
Szczepanik, 883
S.W.2d at 650 (holding evidence company could have expected to retain accounts
for lifetime of accountholders lacked evidentiary foundation and was speculative, as
part of plaintiff=s lost-profits damage model).

     Financing
and Maintaining of Plaintiffs= Ownership
Interest in Kazakhtenge








Even if Tenge Development had approved Plaintiffs= acquisition of
the Kazakhtenge members= interests, Plaintiffs still would have
had to finance the purchase of these interests and then finance the development
of the Tenge Field under Schaefer=s production
plan.  Brickhill testified that, even though Central Asia paid $2 million in
cash at closing plus future conditional payments, he believed that Plaintiffs
could have purchased the interests of the Kazakhtenge members for only $220,000
in cash at closing plus future conditional payments.[20] 
Brickhill based this belief on a November 29, 1999 offer from Van Dyke on these
terms.  Although that offer was rejected, Brickhill believed it was later
accepted, a belief based solely on the February 8, 2000 e-mail from Tresca to
Henkel.   However, at most, this e-mail details an alleged statement by Mingson
Juang of the Taiwanese Company that the Taiwanese Company had set a minimum Alevel of payments@ based on an
earlier offer from Van Dyke and that Central Asia=s current offer
did not meet that minimum.  It does not state that the Taiwanese Company had
accepted an offer from Van Dyke or any of his companies, nor does it specify
whether the Alevel of payments@ refers to cash to
be paid at closing or to future conditional payments.  The e-mail also does not
specify the Van Dyke offer to which the Taiwanese Company refers, and it does
not state that the offer=s Alevel of payments@ was $220,000. 
Even presuming that Plaintiffs could have bought out the Kazakhtenge members
for $220,000 in cash at closing plus future conditional payments,[21] 
Plaintiffs would have had to pay $220,000 plus the initial $14 million that
Brickhill testified would be needed to begin operations under Schaefer=s production plan.[22] 









The evidence at trial showed that Plaintiffs did not have
significant cash on hand.  Regarding the owners, Van Dyke and his mother,
Plaintiffs stipulated that A[f]rom and after January 1, 1997, [Van
Dyke] and [Van Dyke=s mother] did not have sufficient personal
cash, funds, equity, money, or similar financial resources, or any other form
of cash, funds, equity[,] money, or similar financial resources under their
possession, custody, control, to purchase, finance, or acquire any additional
interest in the Tenge Field or to fund the exploration, development, or
further financing of the Tenge Field.@ [23] 
Therefore, Plaintiffs would have had to obtain these funds from third parties
other than Van Dyke and his mother. 








Brickhill did not count on any funds coming from
Plaintiffs, Van Dyke, or Van Dyke=s mother.  Rather,
Brickhill testified that, to finance the acquisition of the Kazakhtenge members= interests and the
development of the Tenge Field, Plaintiffs would have had to obtain financing
from Anew investors.@  Brickhill
anticipated that Shell, Citibank, Lukoil, or Van Dyke=s brother-in-law
would provide this Anew investor@ financing. 
Although he used the term Anew investors,@ Brickhill=s damage model is
based on Plaintiffs= owning all of the equity in Kazakhtenge,
and Brickhill testified that the Anew investors@ would not own a
percentage of the company.  Instead, Brickhill calculated that, for the entire
nineteen-year term, Plaintiffs would pay a total of $447.5 million dollars to
have access to $140 to $200 million of financing.  Brickhill testified that he
was being conservative and that $140 to $200 million is far in excess of the
amount of outside financing that would have been required.  Nonetheless, he
acknowledged that he had not seen a contract containing a binding commitment
from any source to make funds available to Plaintiffs to purchase the interests
of the Kazakhtenge members.  Although Brickhill was not aware of any loan
commitments to lend Van Dyke $14 million to start production, he stated he had
seen indications that Citibank, Shell, or Lukoil would lend these funds to Van
Dyke.[24] 
Brickhill did not explain why he believed these entities would lend Plaintiffs
this money; however, he stated that he was not surprised that no formal loan
commitment had been made because Plaintiffs never bought the interests of the
Kazakhtenge members and it would have been premature to obtain a commitment
until these interests had been purchased.  








The evidence shows that, as of the time period in question,
approximately $16 million had been invested in the Tenge Field with no profit. 
The evidence also shows that Van Dyke unsuccessfully sought loans from Shell,
Texaco, and Citibank[25]
to accelerate production of the Tenge Field.  In the factual context reflected
by the trial record, it was speculative for Brickhill to conclude that
Plaintiffs would have obtained $14.22 million in financing to purchase the
Kazakhtenge interests and start production under Schaefer=s production
plan.  Likewise, it was speculative for Brickhill to conclude that Plaintiffs
could have obtained this funding without giving any equity in Kazakhtenge to
the lender(s).  Moreover, even if an entity would have advanced $14.22 million
to Plaintiffs without receiving an equity stake in the company, Brickhill=s damage model
also presumes that either (1) the lending entity would not have required
Plaintiffs to pledge their interest in Kazakhtenge as collateral to secure the
loan; or (2) if the lending entity did so require, no event of default would
have occurred that would have resulted in Plaintiffs= loss of their
interest in and right to receive profits from Kazakhtenge.[26] 
Additionally, Brickhill set the costs of obtaining financing at 25% of
Kazakhtenge=s share of the field income, but did not explain the
basis for this determination.  The evidence at trial that Plaintiffs would have
obtained sufficient financing to acquire the interests of the Kazakhtenge
members and to commence operations under Schaefer=s production plan
is speculative and not reasonably certain.  See Szczepanik, 883 S.W.2d
at 650 (holding evidence
that
was part of plaintiff=s lost-profits damage model lacked evidentiary foundation and
was speculative);
see also United Way of San Antonio v. Helping Hands Lifeline Found., Inc.,
949 S.W.2d 707, 712 (Tex. App.CSan Antonio 1997, writ denied) (holding
evidence of damages speculative and insufficient as a matter of law because it
was based on the mere hope for funding renewable at the discretion of another
party).

                           Productivity and
Profitability of the Tenge Field

Brickhill relied on Schaefer=s opinions as to
how much oil and gas Plaintiffs could recover from the Tenge Field.  Schaefer
testified that, under his production plan using 96 wells, the Tenge Field would
produce 137.9 million barrels of oil and 911 billion cubic feet of gas over a
nineteen-year period.  Schaefer also testified as follows:

!       He is Apretty certain@ that his projections reflect what would be produced under
his plan.  On a certainty scale of one to ten, Schaefer is about an Aeight@ as far as certainty.  








!       In his opinion, it is not speculative that
19% of the oil in the Tenge Field can be produced over this nineteen-year
period.

!       He used generally accepted mathematical
techniques and formulas to calculate the amount of oil to be produced.

!       There has never been any oil commercially
produced from the Tenge Field.

!       In making his calculations, he did not use
the production history for oil from the Tenge Field because there is no
production history, just test data.

!       Well 109 was drilled in 1974 and then
reentered in 1997 and Atested.@

!       He did not use the production rates from the
well 109 test data in making his calculations.

!       The other well test achieved bad results, and
well 109 initially produced oil at a stable rate for several months and then
stopped producing in September 1997.  Since then, to his knowledge, well 109
has never been back in production.

!       The data from Central Asia=s attempts to develop the Tenge
Field was not available to him, and he did not know Awhat is going on in the Tenge
Field.@

!       Most, if not all, of the reserves in the
Tenge Field would not be categorized as proved reserves.  

Brickhill testified as
follows:

!       Although AD Tenge has never had a dollar=s worth of income since its
inception and AD International has never had more than negligible income in its
twelve to thirteen years of existence, there is no question that the operator
of the Tenge Field will be able to profitably sell gas starting in 2010. 

!       Brickhill=s team did not base its projections of oil production on
the actual amount of oil produced from the Tenge Field in 2001 and 2002,
although it had estimates of actual oil production for those years.

!       Brickhill did not take into account in
projecting the Tenge Field=s future production what the history of oil production had been because
Brickhill believes the past performance is irrelevant.  

!       Approximately three wells were worked over
from 1990 to 2000 in the Tenge Field but Brickhill did not remember what
happened to them, and he did not make an independent investigation to determine
what happened to them.  AThat is not [his] area.@

!       Brickhill was not aware of any profit from
the sale of oil in the Tenge Field at any time.








!       The only profits from the sale of gas in the
Tenge Field that Brickhill was aware of is Athe Communist sense of profits, . . . and the Communists
don=t measure profits in dollars and
cents the way we do . . . .@

!       Brickhill was not aware of any cash flow from
the sale of gas from the Tenge Field at any time.  Brickhill had not seen any
executed contracts for the sale of oil or gas from the Tenge Field, and, to his
knowledge, no such contracts exist. Gas has not been sold from the Tenge Field.


!       Although there has not been a commercial
market for gas from the Tenge Field in the past, there is now.  

!       The only wells that Brickhill was aware of in
the Tenge Field that were worked by Kazakhtenge are well 25 and well 109.  No
production was possible in well 25 because it was blocked by tools that had
been left in the hole.[27] 
Well 109 produced some oil but is no longer producing oil. 








We presume that Schaefer applied generally accepted
mathematical techniques and formulas to the geological information available to
him to calculate the oil and gas in place and the amount of oil and gas that
would be recoverable under his 96-well production plan.  Nonetheless,
Plaintiffs= damage model is dependent upon production from the
oil wells at the beginning of the plan to fund future development.  This
factor, combined with the significant financing that would have been necessary
to acquire the Kazakhtenge interests and to fund the initial attempts to
produce oil, would make production from the initial wells crucial to the
success of Plaintiffs= undertaking.  However,  in calculating
Plaintiffs= lost profits, Schaefer and Brickhill did not quantify
the risk of failure to produce in this early stage of development.  Schaefer
predicted a prolific and profitable field; however, he did not take into
account the history of no commercial oil production from the field, the absence
of oil production from well 25, and the lack of significant oil production from
well 109.  Brickhill stated that he did not take the history of oil production
into account in projecting the Tenge Field=s future
production because he believes the past production is irrelevant.  Likewise,
Brickhill predicted Plaintiffs could market 911 billion cubic feet of gas from
2010 to 2018, even though he admitted that, although the Soviets distributed
gas from the Tenge Field among their citizens free of charge, no gas from the
Tenge Field had ever been sold.  Schaefer testified that most, if not all, of
the reserves in the Tenge Field would not be categorized as proved reserves. 
The failure of the Plaintiffs= damage model to take into account the
important historical data from the field also renders their damage calculations
uncertain and speculative.  See Capital Metro. Transp. Auth. v. Cen. of
Tenn. Ry. & Nav. Co., Inc., 114 S.W.3d 573, 578B82 (Tex. App.CAustin 2003, pet.
denied) (holding there was no evidence to prove lost profits with reasonable
certainty because expert=s testimony was based on unfounded
assumptions rather than objective facts or historical profitability); Aquila
Sw. Pipeline, Inc. v. Harmony Explor., Inc., 48 S.W.3d 225, 246 (Tex. App.CSan Antonio 2001,
pet. denied) (holding petroleum engineer=s evidence of lost
profits to two oil and gas wells was speculative where witness did not base his
calculations on evidence of the historical profitability of the wells in
question). 

Reliance on Calculations by Halliburton
and Ramco Oil








At trial and on appeal, Plaintiffs have focused on
calculations by Halliburton and Ramco Oil that the Tenge Field would be
productive and profitable.  These calculations include production projections
that, although different in some respects, are similar to Schaefer=s projections
regarding the total amount of projected production.  Plaintiffs assert, and
Brickhill and Schaefer testified, that these calculations confirm that their
projections are conservative, correct, and reasonably certain.  However,
Halliburton and Ramco Oil created these calculations for their own use in
analyzing their prospective business opportunities.  They did not submit or
test these calculations in litigation for the purpose of recovering lost
profits on a breach-of-contract claim.[28] 
Companies are free to create speculative, optimistic, and conjectural
projections and to rely upon them in making business decisions.  However, the
mere existence of similar projections created by a company other than the
plaintiff, even by a defendant in the breach-of-contract action, does not
obviate the need for courts to apply the Areasonable
certainty@ test, nor does it indicate conformity with this legal
standard.  See Tex. Instruments, Inc., 877 S.W.2d at 280 (rejecting
plaintiff=s strenuous argument that projections must be
reasonably certain proof of lost profits because even the defendantCTexas Instruments,
Inc.Cbelieved they were
reasonable when they were made).  The fact that Halliburton and the Ramco
Parties at one time may have shared Plaintiffs= hopes regarding
the Tenge Field does not add any substance to Plaintiffs= proof of lost
profits.[29] 
See id. 

                                   Conclusory Statements

Schaefer and Brickhill made several statements that their
calculations were Aconservative,@ Areasonable,@ Anot speculative,@ Abased on reality,@ or Abased on facts.@  At various
times, Brickhill and Schaefer stated that they were Areasonably certain@ about their
projections.  These conclusory and self-serving statements by the experts
describing their own analysis do not affect this court=s need to conduct
an independent review of the record to determine if the evidence satisfies the Areasonable
certainty@ test.  See, e.g., Aquila Sw. Pipeline, Inc.,
48 S.W.3d at 246 (holding petroleum engineer=s evidence of lost
profits to two oil and gas wells was speculative, even though expert used
standard methodologies in his calculations and testified that his calculations
of lost profits were conservative). 








                                          The
One-Percent Solution

Plaintiffs= damage model showed that they suffered
$640 million in lost profits.  Although this lost-profits model was the same
for both Halliburton and the Ramco Parties, the jury found Plaintiffs had
sustained $64 million in lost profits as to Halliburton and $6.4 million in
lost profits as to the Ramco Parties.  Plaintiffs assert on appeal that any
error regarding their lost-profits evidence is harmless because, by reducing
their calculation of lost profits by ninety-nine percent, the jury Ahas wrung out of
the verdict any speculation.@  Plaintiffs argue that A[w]hen the jury
award against [the Ramco Parties] is only one percent of what the experts
calculated, Plaintiffs should not be put in the position of having to justify
the experts= actual figures.@  Texas
jurisprudence on lost profits does not support this proposition.  The two cases
cited by Plaintiffs are not on point.[30] 


Moreover, Plaintiffs= argument
overlooks the possibility that there may have been no  profits at all, if, for
example, Plaintiffs could not have garnered the necessary approval to acquire
the Kazakhtenge interests or obtained sufficient financing to purchase them. 
Furthermore, if there is no evidence proving lost profits with reasonable
certainty, the trial court must render a take-nothing judgment as to
lost-profits damages; it cannot simply reduce the amount of lost-profits
damages or endorse a formulaic reduction of these damages by the jury.  See,
e.g., Tex. Instruments, Inc., 877 S.W.2d at 281 (concluding there was no
evidence to prove lost profits with reasonable certainty and affirming trial
court=s order granting
judgment notwithstanding the verdict as to the lost-profits damages).  For
these additional reasons, Plaintiffs= argument lacks
merit.  

 








                                                       Summary

Schaefer testified that developing the Tenge Field is a Atechnical
challenge@ and demands Aa particular
sophisticated oil company expertise.@  Nonetheless, he
conceded that, to his knowledge, Van Dyke does not have any experience
operating oil fields.  According to Brickhill, this lack of experience is
irrelevant because Van Dyke could have hired others to operate the field.  He
testified that $14.22 million would have been needed to purchase the Kazakhtenge
interests and to begin production in the Tenge Field.  Although Plaintiffs and
Van Dyke had little cash on hand that would have been available for investment
in the Tenge Field, Brickhill testified that Plaintiffs could have obtained
financing from a third-party lender.  This lender, according to Brickhill=s calculations,
would not have required an equity position in Kazakhtenge and either would not
have required Plaintiffs to pledge their interest in Kazakhtenge or would have
required the pledge and Plaintiffs never would have defaulted on their
obligations.  Brickhill did not explain the basis for his opinions in this
regard, nor did he produce any data upon which he relied in concluding that
Plaintiffs would have obtained this third-party financing arrangement.  In
light of the past failure of the field to produce oil or gas for sale and
Kazakhtenge=s past investment of $16 million in the Tenge Field
with no profit, it is speculative to conclude that such financing would have
been available.  Furthermore, to even acquire the Kazakhtenge interests in the
first place, Plaintiffs would have needed the approval of Tenge Development. 
Beyond speculation and an attempt to circumvent the need for Tenge Development=s approval that
fails as a matter of law, Brickhill did not explain why Tenge Development was
likely to approve this transaction.  On this record, it is highly uncertain
that it would have done so.  








In sum, to realize Van Dyke=s Adream and business
plan,@ Plaintiffs first
would have needed to obtain approval from Tenge Development.  Then, despite the
lack of profitable production from the Tenge Field in the past, Plaintiffs
would have had to convince a third-party lender to put millions of dollars at
risk, without compromising Plaintiffs= equity stake and
right to all of the profits in the event of success.  Plaintiffs= lost-profits
calculations are not based on a business that already was established and
making a profit when the contract was breached.  The fervent hope of Brickhill
and Schaefer for Plaintiffs= success in obtaining financing, buying
the Kazakhtenge interests, and producing and marketing oil and gas from the
Tenge Field under Schaefer=s production plan is not enough to warrant
recovery of lost profits.  See Tex. Instruments, Inc., 877 S.W.2d at 280
(stating that A[t]he mere hope for success of an untried enterprise,
even when that hope is realistic, is not enough for recovery of lost profits@).  Plaintiffs= proof of lost
profits is largely speculative, dependent on uncertain and changing market
conditions, and based on risky business opportunities and the success of an
unproven enterprise.  Thus, it is insufficient for recovery.  See id.         








After carefully examining the complicated facts and
circumstances of this case, as developed in this extraordinarily voluminous
record, and applying the applicable standard of review, we conclude that there
is no evidence to prove with reasonable certainty what profits Plaintiffs lost as
a result of the Ramco Parties= breaches of contract.[31]
See id.  (holding there was no evidence to prove lost profits with
reasonable certainty because there was no history of profits and because, even
though there was evidence of a market, the viability of the product was in
doubt because it was a new product that had not yet been created); Burkhart
Grob Luft Und Raumfahrt Gmbh & Co. v. E-Systems, Inc., 257 F.3d 461,
467B68 (5th Cir. 2001)
(holding trial court correctly determined that there was no evidence to prove
lost profits with reasonable certainty under Texas law because of evidence of
plaintiff=s inexperience in building jet aircraft, its lack of a
history of success, and lack of evidence that its bid would have been chosen
over twelve others); see also Miga v. Jensen, 96 S.W.3d 207, 216B17 (Tex. 2002)
(stating that contract damages should not put plaintiff in a better position
than if the contract had been honored by giving the plaintiff a risk-free
investment); Reardon v. Lightpath Techs., Inc., 183 S.W.3d 429, 442
(Tex. App.CHouston [14th Dist.] 2005, pet. denied) (holding that
plaintiffs= requested fraud damages were speculative and would
provide them with the windfall of a riskless investment in a high-risk field). 
Therefore, we hold the trial court erred in denying the Ramco Parties= motion for
judgment notwithstanding the verdict as to the award of lost-profits damages,
and we sustain the Ramco Parties= third issue.            Because
we have sustained the Ramco Parties= third issue and
held that Plaintiffs are not entitled to any lost profits, and because lost
profits were the only damages awarded to them, we hold that Plaintiffs cannot
recover any attorney=s fees, and we sustain the Ramco Parties= seventh issue to
that extent.[32] 
See Green Int=l, Inc. v. Solis, 951 S.W.2d 384,
390 (Tex. 1997) (holding no attorney=s fees were
recoverable under Chapter 38 of the Texas Civil Practice and Remedies Code as
to party that did not recover any damages on its contract claim).

B.      The Ramco
Parties= Entitlement to Summary Judgement on
Plaintiffs= Tort Claims

In their second cross-issue, Plaintiffs contend that the
trial court erred in granting summary judgment as to their claims for breach of
fiduciary duty, misappropriation, and misappropriation of trade secrets.  

In reviewing a traditional motion for summary judgment, we
take as true all evidence favorable to the non‑movant, and we make all
reasonable inferences in the non‑movant=s favor.  Dolcefino
v. Randolph, 19 S.W.3d 906, 916 (Tex. App.CHouston [14th
Dist.] 2000, pet. denied).  If the movant=s motion and
summary‑judgment evidence facially establish its right to judgment as a
matter of law, the burden shifts to the non‑movant to raise a genuine,
material fact issue sufficient to defeat summary judgment.  Id.








In reviewing a no‑evidence motion for summary
judgment, we ascertain whether the non‑movant produced any evidence of
probative force to raise a genuine issue of fact as to the essential elements
attacked in the no‑evidence motion.  Id.  We take as true all
evidence favorable to the non‑movant, and we make all reasonable
inferences therefrom in the non‑movant=s favor.  Id. 
A no‑evidence motion for summary judgment must be granted if the party
opposing the motion does not respond with competent summary‑judgment
evidence that raises a genuine issue of material fact.  Id. at 917.

Did the trial court err in granting
summary judgment as to Plaintiffs= claims for breach of fiduciary duty,
misappropriation, and misappropriation of trade secrets? 








The Ramco Parties filed two motions for summary judgment. 
One motion was filed jointly with all the other defendants then in the case,
and the Ramco Parties filed another motion separately.  In the order from which
Plaintiffs appeal, the trial court granted summary judgment as to all of
Plaintiffs= pending tort claims based on these two motions, which
contained numerous traditional and no-evidence summary-judgment grounds.  Because the trial court did not
specify the grounds upon which it granted summary judgment in favor of the
Ramco Parties, Plaintiffs must show that each independent ground alleged in the
motions for summary judgment is insufficient to support the judgment granted. See Richardson v. 
Darlow, No.  14-03-00830-CV, 2005 WL 283110, at *2 (Tex. App.CHouston [14th Dist.] Feb. 8, 2005, 
no pet.)  (mem.  op.).  In the joint motion for summary judgment, the Ramco
Parties asserted a traditional summary-judgment ground that the Ramco Parties
did not cause Plaintiffs= alleged damages.  The Ramco Parties
argued that, under the undisputed evidence, parties not affiliated with the
Ramco PartiesCrepresentatives of the Joint Enterprise and Plaintiffs= partnersClegitimately had
access to the same information that the Ramco Parties allegedly
misappropriated, and these parties provided this information to Golden Eagle
and Central Asia.  The Ramco Parties also asserted that the undisputed evidence
establishes that Plaintiffs lacked the financial resources to buy out the other
interest owners in the Tenge Field and that these owners would not have sold to
Plaintiffs even if Plaintiffs had possessed these resources.  Although the
Ramco Parties did not challenge causation with a no-evidence ground, this
traditional ground attacking causation is an independent basis for summary judgment. 
Therefore, to effectively challenge the trial court=s rulings on
appeal, Plaintiffs must show, among other things, that this ground is
insufficient to support the trial court=s summary
judgment.  See id.  

In their briefing on cross-appeal, Plaintiffs assert and
argue that (1) the Ramco Parties= argument under Sw.
Bell Tel. Co. v. DeLanney, 809 S.W.2d 493 (Tex. 1991) was not a valid basis
for summary judgment; (2) the Ramco Parties owed Plaintiffs a fiduciary duty;
and (3) Plaintiffs raised a genuine issue of material fact in response to the
Ramco Parties= no-evidence grounds against Plaintiffs= claims for
misappropriation and misappropriation of trade secrets.  At no point in this
appeal, however, have Plaintiffs mentioned or addressed the traditional
summary-judgment ground attacking causation.  Plaintiffs have not presented an
argument showing that this ground is insufficient to support the trial court=s summary
judgment. Though Plaintiffs assert that they raised a genuine issue of material
fact as to the no-evidence summary-judgment grounds, the causation argument was
a ground only in the traditional motion.  Plaintiffs never mention causation in
their argument, and they do not list it as an element of the misappropriation
claims as part of their argument that they raised fact issues as to the
no-evidence grounds.  Furthermore, in their argument regarding alleged fact
issues as to the misappropriation claims, Plaintiffs assert only that they
raised fact issues regarding their possession and ownership of alleged trade
secrets and the Ramco Parties= alleged unauthorized use of these secrets
by transferring them to Golden Eagle.  Because Plaintiffs have not asserted or
shown that the traditional summary-judgment ground attacking causation is insufficient,
we overrule the second cross-issue.  See Richardson, 2005 WL
283110, at *2 (affirming summary judgment because party appealing therefrom did
not argue and show that each of the independent grounds supporting the summary
judgment was insufficient); Humane Soc. of Dallas v.  Dallas Morning News,
L.P., 180 S.W.3d 921, 923 (Tex. App.CDallas 2005, no
pet.) (affirming summary judgment because party appealing therefrom did not
challenge each of the independent grounds supporting the summary judgment and
show that they were insufficient). 








In addition, the trial court did not err in impliedly
ruling that the Ramco Parties did not owe Plaintiffs a fiduciary duty.  There
is no evidence of any preexisting relationship between Plaintiffs and the Ramco
Parties before the business transactions at issue in this lawsuit.  To the
extent Plaintiffs assert a fiduciary duty based on an informal relationship,
this argument fails as a matter of law.  See Schlumberger Tech. Corp. v.
Swanson, 959 S.W.2d 171, 176 (Tex. 1997) (requiring preexisting
relationship to impose fiduciary duty based on informal relationship in
business setting).  Plaintiffs contend that the Ramco Parties owed them a
fiduciary duty based on the relationship between the parties created by the May
1997 Confidentiality Agreement and the November 1997 Letter of Intent. 
However, under the unambiguous language of these documents, no such fiduciary
duty arises. Accordingly, the trial court correctly granted summary judgment in
favor of the Ramco Parties as to Plaintiffs= claims for breach
of fiduciary duty.  

                                                 V.  Conclusion








The trial court did not err in granting
summary judgment on Plaintiffs= claims for breach of fiduciary duty,
misappropriation, and misappropriation of trade secrets.  There is no evidence
to prove with reasonable certainty what profits, if any, Plaintiffs lost as a
result of the Ramco Parties= breaches of contract.  Further, because
Plaintiffs are not entitled to any actual damages, they are not entitled to
attorney=s fees. 
Therefore, the trial court should have granted the Ramco Parties= motion for
judgment notwithstanding the verdict and rendered judgment that Plaintiffs take
nothing as to the Ramco Parties.  Having resolved the case on these issues, we
need not reach the other issues raised in the appeal and cross-appeal. 
Accordingly, we reverse the trial court=s judgment and
render judgment that Plaintiffs take nothing against the Ramco Parties.       

 

 

/s/      Kem Thompson
Frost

Justice

 

 

Judgment rendered, Motion for Rehearing
Overruled, Opinion of June 6, 2006 Withdrawn, and Substitute Opinion filed
October 19, 2006.

 

Panel consists of
Chief Justice Hedges and Justices Fowler and Frost.









[1]  We overrule the motion for rehearing filed by
appellees/cross-appellants Anglo-Dutch (Tenge) L.L.C. and Anglo-Dutch Petroleum
International, Inc.  We withdraw the opinion issued in this case on June 6,
2006, and we issue this opinion in its place. 

 





[2]  The other members of Tenge Development are
Petfintraco S.A., a Liechtenstein company, and Kazakh Exploration, Ltd., a
Texas limited partnership.  





[3]  Because Kazakhtenge is a limited liability company,
those holding ownership interests are called members.





[4]  As explained below, at all material times, AD
Neftenge held its interest in Kazakhtenge subject to a constructive trust in
favor of Tenge Development, which exercises all of AD Neftenge=s rights as a member in Kazakhtenge.





[5]  AD Jersey is another company owned by Van Dyke. 





[6]  Although the parties often refer to this entity as ACentral Asian,@ we
use the name shown in the Purchase Agreement between Central Asia and
Kazakhtenge that was in evidence at trial.





[7]  The reporter=s
record of the trial proceedings consists of 52 volumes, containing more than
7,000 pages, and the clerk=s record
exceeds 9,300 pages.  The trial court admitted more than 560 exhibits into
evidence.  In addition to their original briefing, the parties have filed
extensive supplemental briefs, as well as a number of post-submission motions. 





[8]  The jury question on partnership referred simply to ARamco.@  This term was
not defined in the charge.  In many places in the record and in the briefs
reference is made to ARamco,@ and it is
often unclear if this means both Ramco defendants, only one, or an affiliated
Ramco entity.  In this opinion, we refer to both Ramco defendants as the ARamco Parties.@ 
If the record being described says ARamco@ and it is not clear what is meant, then we, too, will
use only ARamco.@

 





[9]  While the trial court still had plenary power,
Plaintiffs and Halliburton settled all claims between them, and the trial court
vacated judgment on all of Plaintiffs=
claims against Halliburton.





[10]  In many places in the record and in the briefs
reference is made to AAnglo Dutch@
and it is unclear if this means one or both Plaintiffs, or an affiliated Anglo
Dutch entity.  In this opinion, we refer to both Plaintiffs together as  APlaintiffs.@ 
If the record portion we are describing refers to AAnglo Dutch@
without clarifying which entity is meant, then we, too, will use AAnglo Dutch.@





[11]  According to Brickhill, (1) Halliburton had calculated that, if only
oil were produced, 161.2 million barrels of oil could be produced from the
Tenge Field between 2000 and 2018, and (2) Ramco calculated that, if only oil
were produced, 162.9 million barrels of oil could be produced from this field
during this period. 





[12]  As to expenses, Brickhill calculated projected expenses for drilling
and operating wells, production expenses, processing expenses, transportation
expenses, taxes, contractual civic development payments, and other expenses.  However, Brickhill=s team did not make any cost estimates for the transportation of gas.





[13]  According to Brickhill, the Taiwanese Company had Apolitical reasons@
for wanting out of this investment, however, he relied on Van Dyke for this
information.

 





[14]  Brickhill had not talked to Van Dyke regarding the state of AD Tenge=s or AD International=s financial situations in the 1996
through 1999 time frame, nor had he discussed with Van Dyke what the latter=s personal financial situation was
in the 1998 through 2000 time frame.  At his deposition, Brickhill relied on
Van Dyke=s statement that he had access to
the funds necessary to buy out the Kazakhtenge members, but at trial he testified
that he no longer needed to rely on Van Dyke=s account because he had seen Afacts@ independently demonstrating that this was true.  Additionally, Brickhill testified that 

 

!          Van Dyke told Brickhill that he had
sufficient capital to buy out the other Kazakhtenge members. 

!          Brickhill knows that Van Dyke could have
obtained the cash down payment as well as the more than $20 million dollars
that would eventually be necessary to buy out these members.  Brickhill had
seen documents and testimony that the money was available. Brickhill, however,
did not recall seeing a contract in which anybody had agreed to advance Van
Dyke the funds necessary to buy out the other Kazakhtenge members.

!          Brickhill had not seen any contract
containing a binding commitment to make funds available to AD Tenge or AD
International to purchase the interests of the other Kazakhtenge members.    





[15]  Brickhill also noted that in the same e-mail, Tresca
mentioned a
conversation he had with  Mingson Juang, a corporate official with the
Taiwanese Company.  Brickhill concluded
that this e-mail indicated that the Taiwanese Company and others had accepted
or were about to accept Van Dyke=s
offer. 





[16]  According to Brickhill, it would make no sense for people to agree to a
unanimity requirement for the assignment of interests in a limited liability
company like Kazakhtenge. To him, common sense suggested that if Jonathan
Romero (former administrative member of Sugarland) had veto power over Van Dyke=s purchase of  the Taiwanese
Company=s interest, Romero would have
mentioned this power, but he did not.





[17]   Brickhill did not testify as to how the Taiwanese
Company=s continuing obligations under the Kazakhtenge
Regulations would be handled in this scenario.  Even if Plaintiffs indemnified
the Taiwanese Company for its obligations under the Kazakhtenge Regulations, in
light of Plaintiffs= liquidity and credit difficulties, it would be
speculative to presume that the Taiwanese Company would have agreed (1) to have
continuing duties and monetary obligations under the Kazakhtenge Regulations
relating to an interest that it wanted to transfer and from which it would
derive no future benefit and (2) to rely on Plaintiffs= ability to reimburse the Taiwanese Company for its
future expenses and liabilities under the Kazakhtenge Regulations.

 





[18]  We also note that, although Brickhill=s model was not based on Plaintiffs= purchasing Kazakhtenge=s interest in the Joint Enterprise, Central Asia did structure its
transaction in this manner, and some of Van Dyke=s rejected offers involved a company controlled by him purchasing Kazakhtenge=s interest in the Joint Enterprise.  Although
Brickhill=s damage calculations were not based on this type of
transaction, even if they had been, the Kazakhtenge Regulations still would
have required Tenge Development=s approval. 
Section 7.13(a) of the Kazakhtenge Regulations requires unanimous approval of
the Kazakhtenge members for Aselling, leasing,
exchanging, terminating or otherwise disposing of [Kazakhtenge=s] interest in [the Joint Enterprise], . . . or all or
substantially all [Kazakhtenge=s] other
property and assets.@  Therefore, even under this structure, Plaintiffs
still would have needed Tenge Development=s
approval.  





[19]    Brickhill also stated that the facts indicate Van
Dyke would have purchased the interests of the other Kazakhtenge members;
however, this statement is conclusory.





[20]  Other parts of Brickhill=s testimony seem to indicate that Plaintiffs would
have paid $2 million in cash at closing.  Plaintiffs also have indicated
several times in their appellate arguments that they would have needed $2
million at the closing of such a transaction.





[21]  Brickhill testified that Plaintiffs eventually would
have had to pay a total of more than $20 million to acquire the interests in
Kazakhtenge; however, this sum includes the conditional future payments, which
would have been required if the field were profitable, as predicted by
Brickhill.  





[22]  Brickhill testified that more than $300 million
would be needed to develop the Tenge Field over the nineteen-year period;
however, he calculated that much of the necessary funding would come from field
production.  





[23]  (emphasis added). Based on this stipulation, if
Brickhill were correct that the interests of the Kazakhtenge members could be
purchased for only $220,000 in cash at closing, then Van Dyke and his mother
together had less than $220,000 in cash or equity.





[24]  On rehearing, Plaintiffs cite the testimony of David
Adams regarding Baker Hughes as a possible source of financing.  Brickhill did
not refer to the possibility of obtaining financing from Baker Hughes during
his trial testimony, nor did Plaintiffs refer to Baker Hughes in their
appellate arguments on original submission.  Even if this issue were properly
before us, Adams=s testimony does not change the outcome.  Adams
testified that, after discussions with Van Dyke, Baker Hughes offered to rework
ten vertical wells in the Tenge Field for the Joint Enterprise.  Baker Hughes
was willing to advance all of the costs for these wells; however, it was only
interested in reworking ten vertical wells, and it required that it receive
payments from production sufficient to reimburse Baker Hughes for all of its
costs within one year.  Baker Hughes also required that (1) it continue
receiving payments from production after it had recovered all its costs until
it received an additional amount equal to 75% of its costs, and (2) any costs associated
with failed or unproductive reworked wells be added to the amount of costs that
would have to be repaid from production from other successful wells.  Adams
testified that Baker Hughes made an offer to Anglo Dutch, to which Anglo Dutch
made a counteroffer that omitted certain commercial terms that Baker Hughes
considered nonnegotiable.  After Baker Hughes made it clear that the terms in
question were not negotiable, it never heard back from Anglo Dutch.  Adams also
testified that he anticipated that the Joint Enterprise would have signed the
proposed contract with Baker Hughes and that he understood that Anglo Dutch had
authority to sign the contract for the Joint Enterprise.  The record does not
show whether Anglo Dutch or the Joint Enterprise would have found Baker Hughes=s terms acceptable.  Baker Hughes would not have been
available to finance the other 86 wells under Schaefer=s production plan. Brickhill did not base his
calculations on Baker Hughes=s financing ten
reworked wells, and he did not calculate the repayment amounts or the impact of
satisfying Baker Hughes=s repayment terms.  





[25]  On rehearing Plaintiffs point to two letters from
Citibank and to testimony from James Lane regarding preliminary offers from
Citibank to lend up to $20 million to AD International.  The April 30, 1997
letter states that it is (1) without prejudice, (2) not a commitment, (3)
subject to (a) Aextensive due diligence,@ (b) Citibank internal approval, and (c) three fully tested wells.  The
July 1, 1997 letter was made subject to Citibank internal approval,
satisfactory documentation, and Athe
availability of cross-border and political and regulatory conditions at the
time of signing.@  James Lane is a former employee of Citibank.  His
testimony at trial indicated that any loan from Citibank would be subject to
three fully tested wells that would provide evidence of the quality of the
reservoirs in the Tenge Field.  According to Lane, the loan from Citibank never
reached that stage, and the preliminary offer of terms for the loan was also
subject to additional analysis, investigation, and due diligence, which was
never performed.  Van Dyke testified that the reason he did not pursue a loan
with Citibank was that Halliburton told him not to do so because Halliburton
could provide cheaper financing.  However, Van Dyke also testified that, after
Halliburton notified him that it was no longer interested in participating in
the development of the Tenge Field, Van Dyke contacted Citibank in late 1998
about the possibility of the $20 million loan, and Citibank told him that it
had no funds that it could make available for a loan in Kazakhstan.  





[26]  Brickhill did not refer to the possibility of
obtaining financing from Intercapital Resources Investments, Inc. during his
trial testimony.  Plaintiffs did not refer to Intercapital in their appellate
arguments on original submission.  However, on rehearing, Plaintiffs cite an
October 1999 letter from Intercapital containing a preliminary outline of a
proposal to invest $5 million in the Tenge Field. Even if this issue were
properly before us, the amount of the proposed investment was significantly
less than $14.22 million, and the proposal indicates that Intercapital would
require a pledge of 51% of the interest in the Tenge Field to secure the investment.   






[27]  Although during his testimony Brickhill referred to
this well as Awell 52,@
other testimony and exhibits show that the well to which Brickhill refers in
his testimony is actually Awell 25.@  Therefore, Awell
25@ is used throughout this opinion.  





[28]  This point distinguishes the Nip case cited
by Plaintiffs in which this court took into consideration the fact that the
methodology challenged by a party also was endorsed by the challenging party=s expert in his trial testimony.  See Nip v.
Checkpoint Sys., Inc., 154 S.W.3d 767, 772 (Tex. App.CHouston [14th Dist.] 2004, no pet.). The Ramco Parties
did not introduce expert testimony at trial that was dependent upon the same
elements of Plaintiffs= evidence that they now challenge on appeal.
Therefore, Nip is not on point.





[29]  Plaintiffs also assert that other trial evidence supports their
recovery of lost-profits damages.  Plaintiffs cite twenty-four trial exhibits. 
These exhibits show projections of potential production from the Tenge Field,
various operating costs, cash flow, and other data.  Most of these exhibits are
internal work product from Halliburton or Ramco Oil.  Plaintiffs also cite the
testimony of their expert John Wood that (1) with help from Halliburton and
Ramco, Van Dyke should have been able to buy the Kazakhtenge interests and (2)
even without this help, Plaintiffs would have recruited others to help them buy
these interests because, in Wood=s opinion, this is an economically viable field that should
have been developed.  These exhibits and this testimony do not constitute
evidence that proves with reasonable certainty what profits Plaintiffs lost as
a result of the Ramco Parties= breaches of contract.





[30]   See GTE Sw., Inc. v.  Bruce, 998 S.W.2d 605, 619B20 (Tex. 1999) (holding that trial
court=s error in admitting expert
testimony as to whether defendant=s conduct was extreme and outrageous was harmless because
the expert testimony was cumulative of the abundant evidence at trial showing
that this conduct was extreme and outrageous); Tex. Elec.  Serv.  Co.  v. 
Wheeler,  550 S.W.2d 297, 301  (Tex.  Civ. App.CFort Worth 1976) (stating an obiter
dictum in legal-sufficiency analysis in condemnation case that did not involve lost
profits or the reasonable-certainty test), aff=d on other grounds, 551 S.W.2d 341 (Tex. 1977). 





[31]  Plaintiffs also point to testimony by Van Dyke that,
even if he were unable to purchase any additional interest in Kazakhtenge or
Tenge Development, the Ramco Parties=
breaches still caused his company $200 million in damages based on his company=s share of the $640 million dollars in lost profits
calculated by Brickhill.  In addition to being conclusory, Van Dyke=s testimony in this regard relies on Brickhill=s lost-profits calculations.  Therefore, this
testimony does not provide an independent basis to uphold the award of lost
profits.





[32]  The only statute under which Plaintiffs sought
attorney=s fees is Chapter 38 of the Texas Civil Practice and
Remedies Code.